Joseph Tartakovsky (SBN: 282223)
jtartakovsky@eimerstahl.com
EIMER STAHL LLP
71 Stevenson Street, Suite 400
San Francisco, CA 94105
Telephone: 415-508-8801

Nathan P. Eimer (*pro hac vice forthcoming*)
neimer@eimerstahl.com
Vanessa G. Jacobsen (*pro hac vice forthcoming*)
vjacobsen@eimerstahl.com
Alec Solotorovsky (*pro hac vice forthcoming*)
asolotorovsky@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: 312-660-7600

Howard D. Gest (SBN: 76514)
hgest@burhenngest.com
BURHENN & GEST LLP
12401 Wilshire Boulevard, Suite 200
Los Angeles, CA 90025
Telephone: 213-629-8787

*Attorneys for Plaintiffs*

*(Additional counsel on signature page)*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

COMPASS, INC.;
COMPASS CALIFORNIA, INC.; and
COMPASS CALIFORNIA III, INC.,

*Plaintiffs*,

v.

CALIFORNIA REGIONAL MULTIPLE LISTING SERVICE, INC.,

*Defendant*.

Case No. 5:26-cv-06121

**COMPLAINT FOR VIOLATION OF 15 U.S.C. § 1**

**AND RELATED CAUSES OF ACTION**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1. Homeowners should be free to choose how to sell their own homes without having a competition-killing real estate industry organization tell them how to do it. Real estate agents should be able to compete fiercely to be hired by clients, and real estate brokers should be able to compete to attract agents to their firms, without their competitors banding together to restrict how they compete. In dozens of cities across the country, homeowners and agents are free to do that. But this much-needed competition and choice are blocked in approximately twenty-two California counties because of rules set and enforced by Defendant California Regional Multiple Listing Service, Inc. ("CRMLS"). Every single member of CRMLS's Board of Directors is a direct competitor of Compass and its agents, and they are dictating how Compass and its agents can and cannot compete, how Compass and its agents can and cannot serve their clients, and how homeowners can and cannot market their own homes. Plaintiffs bring this lawsuit under 15 U.S.C. § 1 and related state law to stop CRMLS's anticompetitive behavior. Jurisdiction and venue are proper under 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. §§ 1331, 1337, 1367(a), and 1391.

2. Homeowners want a choice. Plaintiffs Compass, Inc.; Compass California, Inc.; and Compass California III, Inc. (collectively, "Compass") offer a phased marketing strategy, See It First™ on Compass, that gives homeowners that choice. Some homeowners choose to use a multiple listing service ("MLS") to market their homes. Some want to publicly market their homes before they go into the MLS—through internet websites, yard signs, social media, and newsletters, among other public marketing methods. Compass and its agents do not force homeowners to use phased marketing or any other strategy; in fact, Compass requires the homeowners' written approval to publicly market outside of CRMLS. Under California law, homeowners are entitled to decide how to market their own properties.

3. One reason homeowners like having this choice is that they can use pre-MLS

public marketing to test the price of a home with real-world feedback from agents and their clients, which helps ensure the home is not overpriced when it lists in the MLS and the MLS sells the listing to every real estate website and data vendor in the world. Moreover, this strategy helps agents and their clients gather feedback on price without the risk of their listings being permanently soiled by price cuts and extended "days on market" that hurt the perceived value of the homes. Homeowners love this choice: where MLSs allow phased marketing, approximately 48% of Compass homeowners used it. Even when publicly marketed pre-MLS, the vast majority of those listings actually sold in the last phase (after being submitted to the MLS). Compared with listings sent straight to the MLS, as CRMLS requires, homes using phased marketing have sold for 4.6% more, with 34% fewer days on the MLS and 29% fewer price cuts.

4. CRMLS, the nation's second-largest MLS by subscriber count, with a gigantic service area in California, is a combination of Compass' direct competitors, and it is controlled by a Board that consists solely of Compass' direct competitors. Under the CRMLS rules, once a homeowner markets the home anywhere on the internet, posts the home anywhere on social media, holds a single open house, provides the listing to an agent outside of their company, or publicly markets the home in any way CRMLS defines as "public marketing," the listing must be given to CRMLS and its co-conspirators within one business day, and the agent and homeowner must follow hundreds of CRMLS restrictions—even if the homeowner gave the agent a lawful marketing instruction that conflicts with the CRMLS rules.

5. Although California law states that real estate agents have a fiduciary duty to obediently, efficiently, and promptly follow the lawful instructions of the client,[1] if a real estate agent follows the client's lawful instruction to publicly market a home outside of CRMLS, the agent then faces fines of up to $2,500 per violation,

[1] Cal. Civ. Code § 2079.16; *Thomson v. Canyon*, 129 Cal. Rptr. 3d 525, 535 (Ct. App. 2011).

suspension, or expulsion from the very MLS they need to do business. More than 40 years ago, in its seminal report on U.S. residential real estate, the U.S. Federal Trade Commission ("FTC") warned that when an MLS forces members to submit their listings, "[a]lternative methods of selling houses are effectively foreclosed."[2] That is what CRMLS has done.

6. Compass brings this lawsuit to stop these illegal rules. Competitors may not band together to dictate how their rivals serve customers and deprive homeowners of choice. Yet that is what CRMLS is doing: using control of a home listing database that real estate agents in much of California cannot work without, CRMLS and its co-conspirators block Compass' better home marketing product to protect Compass' competitors from having to compete with Compass on the merits for clients and agents.

7. Instead of fixing its anticompetitive rules, CRMLS has escalated enforcement against Compass: by CRMLS's own count, roughly a quarter of the CRMLS fines for public marketing in 2026 involve Compass listings. CRMLS's excuses for punishing agents for phased marketing are meritless. In fact, MLSs serving more than 350,000 brokers and agents in at least 12 states do not fine or punish pre- or off-MLS public marketing, and in these markets, the issues CRMLS claims will result from pre- or off-MLS public marketing have not transpired. CRMLS itself allowed pre- and off-CRMLS public marketing until 2019. But now, in a public relations campaign it launched against Compass, CRMLS claims "transparency" and "free riding." CRMLS does not care about homeowners; it is a members-only database that homeowners are unable to access and that fines agents just for following their client's lawful public marketing instructions. Moreover, Compass does not "free ride" as CRMLS claims; it pays CRMLS dues, and it is one of the largest contributors of listings to CRMLS.

---

[2] FTC, *The Residential Real Estate Brokerage Industry* ("Butters Report") at 130 (Dec. 1983).

8. CRMLS and its co-conspirators have caused hundreds of millions of dollars in harm to Compass and its agents, in addition to the immense harm CRMLS has caused to homeowners. Compass seeks treble damages, to the full extent allowed by the law, for every dollar of harm CRMLS and its co-conspirators caused Compass. Compass paid over $175 million to defend and settle lawsuits resulting from MLS policies it could not avoid because rules like CRMLS's foreclosed the option for Compass' agents to publicly market a home without giving it to CRMLS, thus forcing them to follow CRMLS's policies. Although the settlements were the result of MLS rules, CRMLS paid nothing. CRMLS forces Compass and its agents to give their valuable home listing data to CRMLS, which CRMLS then sells to real estate portals and other companies that earn hundreds of millions of dollars displaying Compass listings, paying Compass nothing. Because CRMLS stops Compass from avoiding CRMLS's rules and because CRMLS sells Compass' data to companies that use it against Compass and its agents, Compass has lost (a) millions of dollars in commissions from the diversion of buyer inquiries away from Compass' listing agents, (b) millions of dollars in lost commissions from agents who were recruited away using data the MLS sold to Compass' competitors, and (c) millions of dollars of lost ancillary revenue (such as mortgage, title, and escrow). All of these harms, and any others caused by CRMLS's illegal rules, must be paid back in triplicate, CRMLS's ill-gotten gains from agents must be disgorged, and the illegal rules must be enjoined.

## NATURE OF THE CASE

9. This lawsuit challenges the unlawful conduct of an MLS. MLSs are not pro-consumer, pro-competitive institutions; they are combinations of competing brokers and agents that make rules governing competition among them.[3] As such, MLS rules have long been regarded warily by courts and antitrust enforcers. When

[3] Except where applicable law or regulations would require otherwise, the terms "agent" and "broker" are used interchangeably throughout this complaint.

a group of competitors like an MLS "join together to cooperate in the conduct of their business, there naturally arise antitrust suspicions."[4] As the FTC noted in its seminal report on U.S. residential real estate, the people who control the MLS "control . . . the most important aspects of brokerage practices."[5] That control has been used in the past to do things like set commission rates, discriminate against discounters, discriminate against internet brokerages, and discriminate against minorities.

10. In the 1940s, the U.S. Department of Justice ("DOJ") brought civil and criminal charges against MLSs that set commission rates.[6] Since then, there have been over 100 antitrust investigations and lawsuits challenging mandatory rules imposed by MLSs—many of which challenged rules controlling the public marketing of homes. For example, in a case brought by the FTC against an MLS, a federal court held that a policy limiting the public distribution and display of listings based on the nature of the listing contract "unreasonably restrained competition."[7] Another federal court ordered that an MLS "shall not adopt, maintain, or enforce any Rule . . . that directly or indirectly . . . prohibits, restricts, or impedes any truthful advertising or marketing activities of any home seller or discriminates against or disadvantages any Member or Licensee for any truthful advertising or marketing activity in which any home seller is engaged."[8]

11. CRMLS is the largest MLS in California and the second-largest MLS in the country, with a membership of over 94,000 competing brokers and agents, covering much of California. CRMLS is governed by a Board of Directors composed entirely of those competitors. In fact, all 16 of CRMLS's current Board members are brokers

[4] *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1370 (5th Cir. 1980).
[5] Butters Report at 15.
[6] *See United States v. Nat'l Ass'n of Real Est. Bds.*, 339 U.S. 485, 487 (1950).
[7] *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 819 (6th Cir. 2011).
[8] *United States v. Consol. Multiple Listing Serv., Inc.*, No. 3:08-cv-01786-SB, 2009 WL 3150388, at *2 (D.S.C. Aug. 27, 2009).

or agents who compete with each other and with Compass and its agents.[9]

12. For decades, CRMLS has been an unavoidable and dominant feature of residential real estate brokerage. Participation in CRMLS is essential for any real estate agent to work in many areas of California; real estate agents cannot effectively represent clients in those areas without being members of CRMLS subject to its rules. While many homeowners are well served by pre-MLS or off-MLS marketing strategies, the importance of the MLS means it is still essential for agents to belong to the MLS in the area where they work. Thus, agents cannot survive in business without participating in the MLS.

13. Showing CRMLS's incredible market power, agents must follow CRMLS's rules or CRMLS will fine and punish them, potentially by exclusion from CRMLS. CRMLS polices its members through an investigations team that monitors how its members (who are competitors) represent their clients. CRMLS encourages competing agents to report to CRMLS any rule violations by their competitors for punishment. While the MLS is one of the rare private companies that fines and punishes its own customers, agents accept this because CRMLS membership is critical to their business and because it blunts competition they might otherwise face without the MLS rules.

14. CRMLS Rules 7.8 and 7.9 specifically block competition among brokers and agents, and homeowner choice. Rule 7.8 forces homeowners, brokers, and agents to give CRMLS their listings and forces them into all of the CRMLS restrictions: "Listing Broker shall input into the MLS all properties located in the MLS Service Area within two (2) Days of the Effective Date of any listing agreement on any exclusive right to sell/lease or seller reserved listing agreement on one to four-unit residential property and vacant lots." One of those restrictions, Rule 7.9, dictates how a homeowner can publicly market their property. Unless they give the listing to

[9] *Board of Directors*, CRMLS, https://go.crmls.org/boardofdirectors.

CRMLS within one business day, homeowners and agents may not market or advertise "any information about the property or its availability for sale displayed on any: signs, websites, social media, brokerage or franchise operated websites, communications (verbal or written), multi-brokerage or franchise listing sharing networks, flyers or written material, on any applications, or by conducting an open house." Even though CRMLS does not own the home or represent the homeowner, CRMLS is dictating how the homeowner and their agent must sell the home.

15. The effect of these rules is to prevent homeowners and their agents from publicly marketing homes for sale unless those homes are listed in the MLS and marketed how CRMLS directs (a choice between two extremes: listing it immediately through an MLS and incurring the disadvantages described above; or not publicly marketing the home at all). Through these rules, CRMLS and its co-conspirators control how homeowners and agents market properties on-CRMLS and outside-CRMLS. CRMLS and its co-conspirators, thus, control home marketing across the entire real estate industry in much of California.

16. These rules stand directly in the way of competition. Compass has invested hundreds of millions of dollars in developing technology, competition with other brokerages for agents and clients, and innovative marketing strategies. If a homeowner chooses phased marketing, it proceeds in three phases. In the first phase, the homeowner chooses to publicly market the property via channels outside of the MLS, such as select internet websites, social media, newsletters, yard signs, word of mouth, or other techniques. Homebuyers do not need to work with a Compass agent to view these listings, and agents at other brokerages can view these listings on request. In the second phase, the listing is displayed on the Compass and Redfin websites as a "Coming Soon" and other agents can learn about the property from the MLS. In the third phase, the listing is published by the MLS to tens of thousands of websites and other data recipients.

17. Phases One and Two are blocked by CRMLS rules: Phase One listings cannot be publicly marketed, and Phase Two Coming Soon listings have severe restrictions on what the homeowner and agent can do. Specifically, CRMLS states that even if the homeowner wants their agent to show buyers the property, "No one can show Coming Soon listings to anyone under any circumstances. This includes, but is not limited to, virtual open houses and virtual showings."[10] CRMLS states that all Coming Soons must be restricted to a "21-day limit" even if the homeowner wants their home listed as a Coming Soon for longer.[11]

18. The phased marketing strategy has several advantages for homeowners. MLSs append to the listing (which is the ***homeowner's*** sales pitch to buyers) the history of price changes and days on market, which are perceived by buyers as signaling homeowner desperation. Having price changes and days on market in the homeowner's own advertisement often prevents homeowners from obtaining the full value of their property. This is unique to residential real estate: sellers of other goods are not forced to include, in their advertisements, price changes or how long the good has been for sale. By testing an aspirational price in a pre-MLS phase, homeowners may avoid the harms of unnecessary price cuts or days on the market being added by the MLS to the listing. Phased marketing also offers the chance to sell a house without the inconvenience and loss of choice that comes with listing it for sale through the MLS. In sum, phased marketing is good for some homeowners, good for agents seeking to represent those homeowners, and good for Compass. It does, however, threaten incumbents (that comprise and control CRMLS) by forcing them to compete with Compass for homeowner clients, and to compete with Compass for agents who want a brokerage with innovative marketing strategies and choices they can offer to their clients.

---

[10] *Coming Soon FAQs*, CRMLS Knowledgebase (July 17, 2026), https://kb.crmls.org/knowledgebase/coming-soon-faqs.
[11] *Id.*

19. This unreasonably restrains trade in two ways. CRMLS's agent members, including its Board members, compete directly with one another and with Compass' agents for homeowners, and CRMLS Rules 7.8 and 7.9 block competition from brokers and agents who want to offer innovative, pro-competitive, and pro-consumer public marketing options. As the FTC reported in its landmark study of residential real estate in the United States, "[o]n its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[12] Moreover, CRMLS is blocking competition between competing brokerages (the firms with which agents affiliate) to attract agents with innovative marketing strategies to win more clients.

20. A long history of antitrust enforcement shows why CRMLS Rules 7.8 and 7.9 violate the law. As recognized by the FTC in its seminal report on residential real estate, to comply with the antitrust laws, an MLS must give real estate brokers, agents, and homeowners true alternatives to the MLS—alternatives that existed in California for over 50 years.[13] For example, the "Fourteen Points" antitrust policy adopted in 1971 by the National Association of REALTORS® ("NAR"), which governs CRMLS, expressly provides that an "***MLS shall not: Make any rule regulating the advertising or promotion of any listing***,"[14] and preserves an alternative to the MLS, which it calls an "office exclusive."[15] Before CRMLS Rule 7.9, CRMLS had no restrictions on how office exclusives were publicly marketed. In fact, until 2019, CRMLS had a form titled, "Seller's Instruction to Exclude Listing from the MLS," which included the language "**SELLER instructs broker** (seller to initial only one): A. Market the Property, but do not submit the listing into the MLS

---

[12] Butters Report at 130.
[13] *Id.* at 129–30.
[14] *Id.* at 134 n.354 (emphasis added).
[15] *Id.* ("MLS shall not: Prohibit or discourage a member from accepting a listing from a seller (owner) preferring to give [an] 'office exclusive.'").

until _______”.

21. The FTC found that the Fourteen Points antitrust policy “may have ameliorated any competitive injury which would otherwise have resulted from ‘mandatory’ submissions of listings [like CRMLS Rule 7.8]. Where ‘office exclusives’ are allowed, that is, where the seller can specify that his or her listing not be placed on the MLS, the broker and seller appear to be free to contract as they see fit.”[16] CRMLS Rules 7.8 and 7.9 violate the Fourteen Points antitrust policy and cause the exact competitive injury about which the FTC warned. The DOJ commented on a policy similar to CRMLS’s Rule 7.9 that the “[p]olicy restrict[ed] home-seller choices and preclude[d] competition from new listing services.”[17] The DOJ’s comment echoed the FTC’s 1983 conclusion that “[o]n its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed.”[18]

22. In short, under federal and state law, brokers and agents are entitled to offer, and consumers are entitled to choose from, more than the limited options that the actions of CRMLS’s combination of competitors have forced upon the industry. But CRMLS blocks that choice and the competition that choice would bring.

23. CRMLS and its co-conspirators have harmed brokers and agents including Compass, its agents, and homeowners. Compass is blocked from winning clients, from attracting agents, and from receiving the commissions and other benefits that would come from its competition through innovative marketing strategies. Homeowners are hurt because they (1) cannot sell their own properties however they legally want, including in ways that test the market, and manage the sales process;

---

[16] *Id.* at 130.

[17] *Nat’l Ass’n of Realtors v. United States*, 97 F.4th 951, 954 (D.C. Cir. 2024) (discussing DOJ investigations).

[18] Butters Report at 130.

(2) cannot benefit from marketing strategies that, on average, provide them with a 4.6% higher sale price and 34% fewer days on the MLS; and (3) cannot benefit from the fiduciary duty agents owe to their clients of "utmost care, integrity, honesty, and loyalty."[19]

24. CRMLS has no valid justifications for its illegal conduct. Any claim CRMLS makes is undermined by recent history: until 2019, CRMLS allowed agents and their clients to market pre- and off-MLS without fines, and CRMLS succeeded, growing to be the second-largest MLS in the country, and homes were legally sold throughout California. Moreover, MLSs across the country allow homeowners to publicly market their properties however they want, and those MLSs still exist and succeed, and homes are still sold legally. CRMLS's restraints on competition are not about "transparency." CRMLS does not allow homesellers or homebuyers to become members or to directly search or access its database. CRMLS does not accept for-sale-by-owner listings. CRMLS's own rules allow and even encourage listings to be hidden, just as long as they are not publicly marketed outside of CRMLS.[20] Its restraints also have nothing to do with "free-riding." The free-riding justification was rejected by a federal appellate court in nearly identical circumstances.[21] Compass also gets nothing for free: upon information and belief, agents affiliated with Compass brokerages collectively pay CRMLS more for membership, and provide CRMLS with more listings, than any other brokerage's agents. Even when homeowners publicly market their properties pre-MLS, most would still instruct Compass to give their listings to the MLS before they sell (over 93% of all Compass listings, including listings publicly marketed pre- and off-MLS, are sold after being submitted to the local MLS). On the other hand, CRMLS gives listings to third-party

---

[19] Cal. Civ. Code § 2079.16.

[20] *See* CRMLS Rule 7.9.1 (requiring that "[n]o marketing or advertising of any kind will occur" where the homeowner "instructs the Listing Broker to not disseminate the listing in the MLS").

[21] *Realcomp II, Ltd.*, 635 F.3d at 835.

portals and other companies that do not contribute any listings.

25. Compass hereby brings claims against CRMLS for: (1) violating the Sherman Act, 15 U.S.C. § 1; (2) violating the Cartwright Act, Cal. Bus. & Prof. Code § 16720 *et seq.*; (3) violating the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; (4) intentional interference with prospective economic advantage; and (5) intentional interference with contractual relations.

**PARTIES**

26. Plaintiff Compass, Inc. is a Delaware corporation with its principal place of business in New York, New York. Compass is an innovative, national real estate technology company and brokerage that provides a proprietary, end-to-end cloud-based platform for agents and their clients. Under the brand names "@properties," "Ansley Real Estate," "Better Homes & Gardens Real Estate," "Century 21," "Christie's International Real Estate," "Coldwell Banker," "Compass," "Corcoran," "ERA," "Latter & Blum," "Sotheby's International Realty," and "Washington Fine Properties," Compass operates brokerages and licenses franchises throughout the United States, including California. Compass empowers thousands of agents with cutting-edge technology to better serve homebuyers and homeowners. Compass also has title & escrow and mortgage joint-venture operations across the United States, including California.

27. Plaintiff Compass California, Inc. is a Delaware corporation that is licensed to, and does, operate as a real estate brokerage in California. Its regional headquarters is located at 9454 Wilshire Boulevard, 4th Floor, Beverly Hills, California. Compass California, Inc. is a wholly owned subsidiary of Compass Brokerage, LLC, which in turn is a wholly owned subsidiary of Compass, Inc.

28. Plaintiff Compass California III, Inc. is a Delaware corporation that is licensed to, and does, operate as a real estate brokerage in California. Its regional headquarters is located at 12860 El Camino Real, Suite 100, San Diego, California.

Compass California III, Inc. is a wholly owned subsidiary of Compass Brokerage, LLC, which in turn is a wholly owned subsidiary of Compass, Inc.

29. Compass California, Inc. and Compass California III, Inc. (the "California Brokerages") are participants in CRMLS, are the parties to the listing agreements described below, and are the entities against which CRMLS enforces its rules.

30. Defendant CRMLS is a California nonprofit mutual benefit corporation with its principal place of business at 15325 Fairfield Ranch Road, Suite 200, Chino Hills, California 91709. CRMLS has over 94,000 subscribers and an additional 50,000 agents, brokers, and appraisers who have direct access to CRMLS records via data share agreements with other California MLSs. CRMLS's Board of Directors is entirely comprised of agents who compete with each other and Compass and its agents.

31. CRMLS is a contract, combination, or conspiracy of competing agents and brokers. CRMLS's participating brokers and agents compete directly with one another and with Plaintiffs for homeowner clients, homebuyer clients, and agents. Those brokers and agents follow and enforce CRMLS's rules, and CRMLS is governed by a Board of competing brokers and agents.

32. CRMLS Rule 7.10 defines its "Service Area" as "the entire county that contains any of the territorial jurisdiction of (1) any member association, or (2) any data share partner AOR ["Association of Realtors"]/MLS," which covers approximately twenty-two counties in California.[22] Moreover, CRMLS is the only MLS in the following areas of California: Riverside County (Inland Valleys, Southwest Riverside, The Inland Gateway), San Bernardino County (High Desert, Joshua Tree Gateway), West San Gabriel Valley, Arcadia, Pasadena-Foothills, Montebello District, Rancho Southeast, Citrus Valley, Butte, Colusa, Glenn, Lake,

[22] *Compilation List of CRMLS Reciprocal Agreements and C.A.R. Master Reciprocal List*, CRMLS, https://go.crmls.org/compilation-list-of-crmls-reciprocal-agreements-and-c-a-r-master-reciprocal-list.

Madera, Mariposa, Merced, Tehama, Tuolumne (Sierra North Valley / Oroville-Paradise area), Coastal Mendocino, North San Luis Obispo, Pismo Coast, and San Luis Obispo Coastal.

## DEFENDANT'S CO-CONSPIRATORS

33. Competing agents, including those enforcing CRMLS's rules and members of CRMLS's Board of Directors, conspired with each other and CRMLS to design, approve, enforce, and implement CRMLS Rules 7.8 and 7.9. On information and belief, CRMLS has encouraged other MLSs to adopt and maintain rules similar to Rules 7.8 and 7.9.

34. CRMLS's co-conspirators performed acts and made statements in furtherance of CRMLS's anticompetitive conduct. CRMLS is jointly and severally liable for the acts of its co-conspirators, whether or not they are named as defendants in this complaint.

## JURISDICTION AND VENUE

35. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because Compass brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking injunctive relief, damages, treble damages, cost of suit, and reasonable attorneys' fees, arising from CRMLS's and unnamed co-conspirators' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

36. This Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and has supplemental jurisdiction over Compass' state-law claims under 28 U.S.C. § 1367(a) because those claims arise from the same nucleus of operative fact as the federal claims.

37. This Court has personal jurisdiction over CRMLS because its headquarters and principal place of business are in this district, and CRMLS conducts substantial business in this district.

38. Venue is appropriate in this district because CRMLS's headquarters and

principal place of business are in this district and because a substantial portion of the transactions and events giving rise to this action—the agreement among the competing brokerages and the actual and threatened enforcement of anticompetitive rules—occurred in this district. 28 U.S.C. § 1391; 15 U.S.C. § 22. CRMLS initially registered as a corporation with the California Secretary of State in 1989 and lists its principal address, mailing address, and agent for service in this district.

## TRADE AND COMMERCE

39. CRMLS has entered into agreements with each of its over 94,000 members and facilitates the sale of hundreds of thousands of residential homes and condominiums, with total closings valued in at least the tens of billions of dollars. These transactions, together with the associated mortgage financing, out-of-state buyers and homeowners, and national title insurance, are in and have a substantial effect on interstate commerce, as used in 15 U.S.C. § 1.

## RELEVANT MARKETS

40. Relevant Product Markets. There are at least three relevant product markets: (1) provision of real estate brokerage services to homeowners (the "Brokerage Services Market"); (2) provision of real estate brokerage services to agents who represent homeowners (the "Agent Services Market"); and (3) provision of multiple listing services to brokers and agents who represent homeowners (the "MLS Market") (collectively, the "Relevant Markets").

a. The Brokerage Services Market includes the services that brokerages and agents provide their homeowner clients. Those services include, among other things, advising on pricing and marketing, conducting marketing activities, and negotiating with buyers. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of brokerage services likely would undertake at least a small but

significant and non-transitory increase in price or other worsening of terms. Compass and the brokerages and agents who participate in and control CRMLS compete in the Brokerage Services Market.

b. The Agent Services Market consists of services that brokerages provide to agents. Those services include, among other things, sharing commissions with the agent, developing and maintaining a strong brand that appeals to consumers, investing in and providing technology agents can use in representing clients, and supporting agents in representing their clients, including by offering innovative and appealing ways to better serve their clients. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of agent services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Compass and the brokerages who participate in and control CRMLS compete in the Agent Services Market.

c. The MLS Market consists of the services that MLSs provide to brokers and agents. Those services include a repository of property listings, distribution of listings to other agents, and syndication of those listings through data sharing feeds to other participants, including the other real estate brokers and agents in the area and the large public-facing aggregator websites such as third-party portals. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of multiple listing services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. CRMLS participates in the MLS Market.

41. Relevant Geographic Market. The relevant geographic market for each of the defined product markets is no larger than CRMLS's service area, as defined by CRMLS Rule 7.10. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of each of the relevant products in this geographic market likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Brokers and agents cannot avoid CRMLS's rules by using a neighboring MLS or an MLS with a data sharing agreement with CRMLS for several reasons:

a. Brokers and agents need to be members of the MLS that covers their region because being an "out-of-region" broker or agent makes it harder to attract clients and agents.

b. CRMLS and the MLSs with which it has data sharing have rules based on the California Association of Realtors model (such as CRMLS Rule 6) that provide CRMLS's rules are imported to the data share MLSs and vice versa: "the Participants and Subscribers agree to abide by the respective rules of the other MLSs receiving and publishing a listing pursuant to such agreements and to abide by such rules when accessing the other databases or datasets."

c. CRMLS Rule 7.10 provides that "[i]f the AOR/MLS have entered into regional MLS agreements or a regional MLS corporation with other MLSs and have enlarged the service area as part of the agreement, submission of listings is mandatory for the enlarged service area covered by the combined territorial jurisdictions of the AOR's signatories to the regional MLS agreement or part of the regional MLS corporation."

d. CRMLS rules apply to all agents and listings affiliated with a "Listing

Broker," which means that every listing by an agent affiliated with a brokerage must be given to CRMLS, even if the agent is not a member of CRMLS, does not submit it to CRMLS, and the homeowner does not want it in CRMLS. Even if the brokerage has only a single agent who needs to access CRMLS, the entire brokerage must become a member. Specifically, CRMLS Rule 7.8 provides that the "***Listing Broker*** shall input into the MLS all properties located in the MLS Service Area," (emphasis added) and under CRMLS Rule 4.7, "[w]henever these rules refer to the Listing Broker, the term shall include a Subscriber in addition to the Participant or a licensee retained by the Listing Broker but shall not relieve the Listing Broker of responsibility for the act or rule specified." Thus, if one agent in a brokerage needs CRMLS access, then all agents in that brokerage are bound by CRMLS's rules.

To serve their clients and compete in the CRMLS service area, brokers and agents must have access to CRMLS and follow CRMLS's rules. Thus, in both the Brokerage Services Market and the Agent Services Market, the brokers and agents that combine to adopt, follow, and enforce the CRMLS rules collectively have market power. In the MLS Market, CRMLS has market power.

42. As the DOJ has alleged, "By virtue of industry-wide participation and control over a critically important input, the MLS (a joint venture of competing brokers) has market power in almost every relevant market."[23] And, as the DOJ and FTC reported, "[a]s the primary source of information about homes currently for sale and the prices at which other, comparable homes have been sold, the MLS is an extraordinarily important resource for homeowners, buyers and brokers. . . . MLSs are so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in the local

[23] Am. Compl. ¶ 24, *United States v. Nat'l Ass'n of Realtors*, No. 05-C-5140 (N.D. Ill. Oct. 4, 2005), *reprinted in* 73 Fed. Reg. 36,104, 36,105 (June 25, 2008).

MLS."[24]

## FACTUAL ALLEGATIONS

***MLSs and the Antitrust Laws***

43. An MLS aggregates listings submitted by participating agents into a common database and makes the resulting data available to MLS participants and subscribers. CRMLS is in the business of operating a broker cooperative by providing information and services to real estate brokers, agents, or appraisers for use in their professional activities by:

a. Collecting from real estate agents, brokers or appraisers real-estate information and data, including but not limited to listing information.

b. Enhancement and organization of that information and data with other property information to create property records.

c. Distribution and display of those collected property records to real estate brokers and appraisers for their use in listing, selling, leasing, and valuing real estate for the benefit of consumers.

d. Distribution of those collected property records to non-broker entities that use the property records to support real estate transactions or the real estate industry.

e. Providing services, rules and systems that facilitate the cooperation between different brokers, and agents to represent clients in real estate transactions.[25]

44. MLSs also make and enforce rules. CRMLS explains how competing agents can help enforce CRMLS's rules, and it provides a specific process and email

---

[24] DOJ & FTC, *Competition in the Real Estate Brokerage Industry* 12 (Apr. 2007) ("2007 DOJ/FTC Report"), *available at* https://www.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf.

[25] CRMLS Rule 2.

address to report violations of CRMLS Rule 7.9.[26]

45. In addition to operating this members-only database, some MLSs, like CRMLS, sell agent and homeowner data to third parties, such as real estate web portals, which monetize it in various ways, *e.g.*, selling leads for potential buyers to agents by displaying the data on websites with advertising alongside, and by creating tools to recruit agents from brokerages.

46. Brokerages that have adopted the traditional, mutually aligned business model of real estate sales rely passively on one another to provide their listings to each other via the MLS. MLSs that are comprised of or governed by brokerages and agents with traditional business models have a strong financial incentive to impair the business models of innovators and mavericks who seek to offer marketing options to homeowners that eschew immediate and automatic sharing of their listings on the MLS regardless of the circumstances or preferences of the homeowner. Such MLSs, and the traditional brokerages and agents that control them, try to prevent their members from publicly marketing properties off-MLS, because publicly marketing off-MLS presents a competitive challenge to the traditional brokerages.

47. MLSs are private companies. Unlike agents, MLSs do not owe fiduciary duties to anyone, let alone consumers. They are not government entities or law enforcement agencies, even though they pretend to have similar powers when interacting with agents. MLSs are not inherently pro-consumer, pro-competitive institutions; they are organizations of competing agents that make rules governing competition among them. But MLSs act like they are law enforcement and wield the unique power to fine and punish their own customers.

48. As such, MLSs and their rules have long been regarded warily by courts and antitrust enforcers. When competitors "join together to cooperate in the conduct of

[26] *Matrix: How to Report a Potential Violation*, CRMLS (Apr. 15, 2025), https://kb.crmls.org/knowledgebase/reporting-a-violation.

their business, there naturally arise antitrust suspicions."[27] As the FTC noted in its seminal report on U.S. residential real estate, control over the MLSs gives "Realtor groups the single most powerful tool available for shaping brokerage practice."[28] That control has been used in the past to do things like set commission rates, discriminate against discounters, discriminate against internet brokerages, and discriminate against minorities.

49. In the 1940s, the DOJ brought civil and criminal charges against MLSs that set commission rates.[29] Since then, there have been over 100 antitrust investigations and lawsuits challenging mandatory rules imposed by MLSs—many of which challenged rules controlling the public marketing of homes. For example, in a case brought by the FTC against an MLS, a federal court held that a policy limiting the public distribution and display of listings based on the nature of the listing contract "unreasonably restrained competition."[30] Another federal court ordered that an MLS "shall not adopt, maintain, or enforce any Rule . . . that directly or indirectly . . . prohibits, restricts, or impedes any truthful advertising or marketing activities of any home seller or discriminates against or disadvantages any Member or Licensee for any truthful advertising or marketing activity in which any home seller is engaged."[31]

50. Recognizing the pro-competitive benefits of pre-MLS marketing strategies is consistent with the federal antitrust agencies' long-standing views of the real estate markets. "[T]he Agencies have challenged, as antitrust violations, MLS rules that unreasonably restrict competition by brokers who use alternative business models."[32] For example, the DOJ and FTC have brought cases ensuring that discount

---

[27] *Realty Multi-List*, 629 F.2d at 1370.
[28] Butters Report at 92–93.
[29] *See Nat'l Ass'n of Real Est. Bds.*, 339 U.S. at 487.
[30] *Realcomp II, Ltd.*, 635 F.3d at 819.
[31] *Consol. Multiple Listing Serv., Inc.*, 2009 WL 3150388, at *2.
[32] 2007 DOJ/FTC Report at 63; *see also Realty Multi-List*, 629 F.2d 1351; *Realcomp II*, 635 F.3d 815.

brokers and fee-for-service brokers were not denied MLS access.[33]

51. This history is long-standing and specific. On behalf of all its affiliated MLSs, NAR addressed this antitrust problem in 1971. As the FTC described in its seminal report:

> By the late 1960's and early 1970's, MLSs had been named in a number of private antitrust actions and Justice Department investigations. Justice Department investigations culminated in 15 consent orders banning price fixing and other alleged anti-competitive activities. In response to these legal problems, the National Association of Realtors developed and enforced a list of policy points.[34]

52. NAR's November 15, 1971, statement, setting out and mandating these policies on the Realtor MLSs, is referred to in the industry as the "Fourteen Points" antitrust policy. Point 11 of the policy specifically addressed the antitrust problem caused by mandatory submission rules by guaranteeing an alternative method of selling residential properties to the MLS: the "office exclusive."[35] Specifically, the antitrust policy expressly provided that "***MLS shall not: Prohibit or discourage a member from accepting a listing from a seller (owner) preferring to give [an] 'office exclusive.'***"[36] Point 10 provided that "***MLS shall not: Make any rule regulating the advertising or promotion of any listing.***"[37] The FTC found that the Fourteen Points antitrust policy "may have ameliorated any competitive injury which would otherwise have resulted from 'mandatory' submissions of listings. Where 'office exclusives' are allowed, that is, where the seller can specify that his or her listing not be placed on the MLS, the broker and seller appear to be free to

[33] 2007 DOJ/FTC Report at 64 (describing and citing cases).
[34] Butters Report at 109.
[35] *Id.* at 130.
[36] *Id.* at 134 n.354 (emphasis added).
[37] *Id.* (emphasis added).

contract as they see fit."[38] The term "office exclusive" just meant the listing was not provided to the MLS, and before CRMLS Rule 7.9, a homeowner could market the home however she wanted. Therefore, CRMLS's mandatory submission rules cannot possibly comply with the antitrust laws because agents and homeowners have no freedom to avoid CRMLS's restrictions or market their homes how they choose under CRMLS Rules 7.8 and 7.9.

***CRMLS Rules 7.8 and 7.9***

53. CRMLS's rules are designed and approved by the competing brokers and agents who sit on its Board of Directors. CRMLS Rule 3 explains: "The AOR/MLS shall be governed by its board of directors . . . in accordance with its articles of incorporation and its bylaws. Committees may be established to perform such functions as may be delegated, but all actions of committees shall be subject to the approval and confirmation of the Board of Directors."

54. Rule 7.8 provides that the "Listing Broker shall input into the MLS all properties located in the MLS Service Area within two (2) Days of the Effective Date of any listing agreement on any exclusive right to sell/lease or seller reserved listing agreement on one to four-unit residential property and vacant lots." Rule 7.9 dictates how homeowners can publicly market their properties. Unless they give the listing to CRMLS within one business day, agents and homeowners may not market or advertise "any information about the property or its availability for sale displayed on any: signs, websites, social media, brokerage or franchise operated websites, communications (verbal or written), multi-brokerage or franchise listing sharing networks, flyers or written material, on any applications, or by conducting an open house."[39] The effect of these rules is to prevent homeowners and their agents from publicly marketing homes for sale unless those homes are listed in the MLS.

55. If a CRMLS participant violates CRMLS's rules, CRMLS can punish the real

---

[38] *Id.* at 130.

[39] CRMLS Rule 7.9.

estate agent and/or brokerage by levying fines or blocking their access to the listings database.[40] Pursuant to CRMLS's "MLS Citation Policy," a violation of CRMLS Rule 7.8 or 7.9 is punishable by a fine of $500 to $2,500.[41] The MLS Citation Policy also gives CRMLS discretion to impose "additional fees or fines, suspension, or expulsion."[42] CRMLS polices its rules, as do CRMLS's members.

***See It First™ on Compass***

56. A homeowner may decide to submit a property listing immediately to the MLS for distribution. Alternatively, a homeowner may decide to engage in one or more public marketing strategies that precede distribution through the MLS. These pre- and off-MLS strategies may take a number of different forms. "Office exclusives" are a long-standing practice of publicly marketing a property off the MLS. Another alternative is a "Coming Soon" listing, where a listing is available to other participants in the MLS and may be posted to an agent's website or to other selected websites.

57. Compass is an innovative, technology-forward real estate brokerage. From its founding in 2012, Compass has invested in and developed pre- and off-MLS marketing strategies. These marketing strategies allow homeowners to choose effective options to meet their goals. Today, Compass refers to these strategies under its "See It First™ on Compass" umbrella; a prior version was called Compass' 3-Phased Marketing Strategy. Compass agents offer See It First™ on Compass to clients everywhere, although CRMLS impedes that competition to protect its members, who are Compass' competition.

58. Compass agents always discuss the advantages and disadvantages of immediate MLS distribution and phased marketing with the homeowner. The

---

[40] *MLS Citation Policy*, CRMLS (July 10, 2026), *available at* https://go.crmls.org/crmls-citation-policy.

[41] *Id.* at 3.

[42] *Id.* at 2.

homeowner decides what to do. When working with a Compass agent, a homeowner who opts to use See It First™ on Compass as a strategy signs disclosures[43] acknowledging that the listing will not initially appear in the active MLS feed.

59. In the first phase of See It First™ on Compass, agents do not list the property on the MLS but publicly market listings in every off-MLS way allowed by local MLS rules, including informing viewers on Compass' website that (unspecified) off-MLS listings exist in the area in which the user is searching. A prospective buyer need not hire a Compass agent, or any agent, to learn about or obtain access to these listings. A buyer may contact a Compass office directly, ask a non-Compass agent to contact Compass, or register on their own without charge. Agents at other brokerages also can view these listings on request.

60. In the second phase of See It First™ on Compass, the listing moves to a "Coming Soon" status. If the homeowner instructs the agent to do so, Compass advertises "Coming Soon" listings to its own website and also distributes them to Redfin.com, a third-party real estate site, which combined have over 50 million monthly active users. Coming Soon status signals to prospective buyers that the property will soon become active on the MLS and allows the homeowner to gather valuable feedback about the property before that point.

61. Finally, after these first two phases, the property moves to the third phase and goes active on the MLS and is sent by the MLS to tens of thousands of internet websites and data vendors. The homeowner and agent benefit from the pre-MLS phases because they will have provided insight on pricing, staging, and marketing strategy. Some listings sell before reaching broad MLS distribution, but more than 93% continue to the third phase, listing on the MLS.

62. The listing is the homeowner's advertisement for the home. Like any seller of property, the homeowner is entitled to say whatever she wants in the listing to sell

[43] These disclosures are available at https://www.compass-homeowners.com.

the home so long as the listing complies with the law. And, just like a seller of anything, a homeowner should not be forced to put things into their advertisement that hurt the homeowner unless required by the law. A homeowner should not be forced to tell a buyer all the ways that the buyer can negotiate against the homeowner. But the MLS forces the homeowner's advertisement—the listing—to contain things that are not required by the law and that no reasonable homeowner would want in their listing, including days on market and history of price changes.

63. The phased marketing strategy has several advantages for homeowners.

a. ***First,*** because MLSs put the history of price changes onto the listing, and price cuts are perceived by buyers as signaling desperation, homeowners often forgo asking a higher price at the outset to avoid the risk of having to cut the price and reduce their bargaining leverage relative to buyers. This can prevent homeowners from obtaining the full value of their properties. By testing an aspirational price in a pre-MLS phase, homeowners may obtain a higher price with less risk of a price cut later. A pre-MLS listing also avoids third-party aggregators applying their own flawed pricing algorithms to public listings, which could reduce the amount potential buyers might offer for the property.

b. ***Second***, because off-MLS pre-marketing reduces the risk to homeowners of attempting to market their property before making costly upgrades, renovations, cosmetic improvements, professional photographs, or other investments, off-MLS pre-marketing can save the homeowner the costs of making such investments.

c. ***Third,*** MLSs publish the number of days a listing has been on the MLS and a higher number is likewise perceived by buyers as increasing their bargaining leverage relative to sellers. Pre-MLS marketing allows homeowners to test the market, build buyer interest, and refine their

strategy without incurring days on the market.

d. ***Fourth,*** pre- and off-MLS marketing offer the chance to sell a house without the inconvenience that comes with publicly listing it for sale and offer the chance to assess whether expensive renovations are necessary to make the house more attractive to the broader market. Indeed, a homeowner may not yet be fully convinced that they want to sell the property or may want to avoid disruptive showings.

64. See It First™ on Compass offers homeowners the ability to market a property prior to full preparation, which may allow homeowners to reduce or avoid the costs, time, and risks associated with pre-sale improvements, while retaining the option to accept or decline early offers. Indeed, reported transactions are consistent with these benefits. For example, a homeowner experiencing a time of distress needed to sell her property quickly, and was able to secure a buyer within a short period, without dimensions or even pictures through pre-marketing. Compass agents appreciate the ability to offer innovative strategies that help homeowners achieve their goals. For example, a Compass agent who had briefly joined a competing brokerage returned to Compass, expressing excitement about See It First™ on Compass.

65. This phased marketing strategy is good for homeowners, good for agents seeking to represent homeowners, and good for Compass. Compared with listings sent directly to an active MLS feed, properties marketed through Compass' phased marketing strategy had 34% fewer days on the MLS and experienced 29% fewer price cuts. Additionally, properties sold for 4.6% more. The phased marketing strategy does, however, threaten incumbent brokerages by forcing them to compete against Compass for homeowner clients and for agents who want to offer such innovative marketing strategies to their homeowner clients.

66. Homeowner demand for phased marketing has been substantial in the many areas of the country where MLSs allow Compass to offer it. By March 2025,

approximately 48% of Compass homeowners selected phased marketing. After March 2025, the percentage of phased marketing listings fell due to Zillow's adoption of "Listing Access Standards" banning pre-marketed listings from Zillow and affiliated sites. The Listing Access Standards are similar to CRMLS's Rule 7.8 and Rule 7.9 in that they deny access to a public marketing platform, in that case Zillow's, based solely on the homeowner's decision to first market a property by other means. In a recent federal antitrust case, Zillow argued that its Listing Access Standards promoted competition by reducing pre-MLS marketing, but the court held both that Zillow failed to prove its claims and that the "record . . . identifie[d] plausible procompetitive effects from" strategies such as Compass' phased marketing strategy.[44]

67. Recognizing the benefits of pre- and off-MLS marketing for many homeowners, many MLSs do not penalize agents and homeowners for such marketing. MLSs serving more than 350,000 brokers and agents in at least 12 states allow homeowners to publicly market their properties, and those MLSs continue to succeed.

***Anticompetitive Effects***

68. CRMLS Rules 7.8 and 7.9 restrain trade in several ways.

a. ***First***, because CRMLS's participating brokers and agents (including Board members) compete directly with one another and with Compass and its agents for homeowners and homebuyers, implementation and enforcement of CRMLS Rules 7.8 and 7.9 block competition from agents who want to offer innovative, pro-competitive, and pro-consumer public marketing options. As the FTC reported in its landmark study of residential real estate in the United States, "On its face, requiring that MLS members submit all of their listings of a

[44] *Zillow Group, Inc. v. Midwest Real Est. Data LLC*, No. 1:26-cv-05451, Mem. Op. & Order 43–44 (N.D. Ill. Sept. 15, 2026).

designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[45]

b. ***Second***, CRMLS is blocking competition by other public marketing methods, identified by CRMLS Rule 7.9 as "signs, websites, social media, brokerage or franchise operated websites, communications (verbal or written), multi-brokerage or franchise listing sharing networks, flyers or written material, on any applications, or by conducting an open house," and most significantly the Compass website itself.

c. ***Third***, CRMLS Rules 7.8 and 7.9 also reduce competition among brokers, including Compass, by preventing them from competing through the timing, sequence, and scope of a listing's distribution.

d. ***Fourth***, CRMLS Rules 7.8 and 7.9 further reduce competition among brokers, including Compass, by preventing them from competing to attract agents by offering them innovative, appealing ways to serve their homeowner clients.

***CRMLS's Justifications Are Pretextual***

69. CRMLS has no valid justification for its illegal conduct. CRMLS operated without such rules before 2019, and many MLSs across the country allow homeowners to publicly market their properties however they want, and those MLSs still exist and succeed. These rules are not required for operating a successful MLS. These are not rules that ensure the integrity of the data distributed by CRMLS or prohibit its members from selectively editing or excluding the CRMLS listings they show their buyer clients. CRMLS Rules 7.8 and 7.9 govern marketing itself and require brokers and their clients to forgo profitable strategies on pain of being fined

---

[45] Butters Report at 130.

by or excluded from the MLS.

70. CRMLS's restraints on competition are not about "transparency." CRMLS does not allow homeowners or homebuyers to become members or to directly access its database. CRMLS does not accept for-sale-by-owner listings. And CRMLS's own rules allow and even encourage listings to be hidden, just as long as they are not publicly marketed.[46] Nor are CRMLS's restraints about equal access for buyers; any buyer, and any buyer's agent, can learn about, tour, and make an offer on a property marketed through See It First™ on Compass without hiring a Compass agent. Indeed, without See It First™ on Compass as an option, some homeowners would not choose to sell their property, ultimately reducing the inventory of homes on the market.

71. CRMLS's restraints also have nothing to do with "free-riding." In pre-suit correspondence with Compass, CRMLS has accused Compass of seeking to "free ride" on the MLS by participating when it chooses but otherwise withholding listings from the MLS. That is nonsense. In the first place, Compass does not seek special treatment. If Compass has its way, ***every*** member of CRMLS will be free to offer pre- and off-MLS marketing strategies to their clients.

72. Compass does not benefit from the contributions of other brokerages to the MLS without contributing to the benefits that other brokerages can obtain from the MLS. Compass contributes substantially to the benefits obtained by other brokerages and would continue to do so under the See It First™ on Compass program. Compass provides value to CRMLS and its members in three critical ways: (1) by exposing its buyer clients to listings submitted by other members; (2) by submitting listings to CRMLS post-sale even when they were not previously submitted to CRMLS, adding to the body of information that members use for advising clients on pricing

---

[46] *See* CRMLS Rule 7.9.1 (requiring that "[n]o marketing or advertising of any kind will occur" where the homeowner "instructs the Listing Broker to not disseminate the listing in the MLS").

and other matters; and (3) by submitting listings to CRMLS for the benefit of all buyer agents in the CRMLS service area after the first two phases of the phased marketing strategy, which would happen for over 93% of all pre-marketed listings based on experience elsewhere. Indeed, upon information and belief, among Compass' various brokerages, its agents contribute more member dues to CRMLS than any other brokerage's agents. Compass is also one of the largest contributors of listings to CRMLS.

73. In pre-suit correspondence, CRMLS asserted other arguments about the purported drawbacks of pre- and off-MLS marketing that amount to little more than paternalistically telling homeowners and their agents what is best for them. Competition requires innovation, and consumers will ultimately decide what innovations are worthwhile.

74. CRMLS's purported alternatives do not cure the restraint. CRMLS Rule 7.9.1, called a "No Cooperation Listing," requires that the property be kept hidden and marketed exclusively within the listing brokerage—no yard sign, no website, no social media post, and no open house. CRMLS's exemption for "open listings" requires the homeowner and the agent to give up the exclusive representation that most homeowners want and that standard California listing forms provide.[47]

***Antitrust Injury to Compass, Its Agents, and Homeowners***

75. CRMLS's conduct causes significant, direct harm to Compass, its agents, and consumers. The harm resulting from this anticompetitive scheme encompasses the following:

a. <u>Lost Commissions and Financial Harm to Brokerage</u>: Compass has suffered direct financial harm through lost commissions due to

---

[47] The DOJ views mandatory-listing policies, coupled with "exceptions benefitting primarily large brokerages," as anticompetitive. Supplemental Statement of Interest of the United States, *Nosalek v. MLS Prop. Info. Network, Inc.*, No. 1:20-cv-12244-PBS, ECF No. 358, at 7 n.2 (D. Mass. Mar. 17, 2025). Rule 7.9.1 is precisely the sort of "exception" that makes CRMLS Rules 7.8 and 7.9 anticompetitive.

Compass' inability to offer homeowners its phased marketing strategy, a superior product that attracts homeowners to Compass. Compass has also suffered direct financial harm through lost revenue from those homeowners through ancillary services, such as title and escrow services and mortgage services.

b. Degradation of Compass Website: The enforcement of CRMLS Rules 7.8 and 7.9 degrades Compass' proprietary technology platform by preventing Compass from posting pre-MLS listings in See It First™ on Compass, artificially suppressing web traffic and prospective leads.

c. Depressed Sales Prices and Lost Sales: By eliminating Compass' ability to pre-market and test pricing, CRMLS rules force homeowners to launch blind on the MLS, frequently resulting in mispricing that depresses final home values, in lost sales, and in reduced commissions.

d. Excessive Days on Market and Public Price Drops: Forcing properties onto the MLS prematurely subjects them to the stigma of accumulating "days on market" and price reductions ***on the listing***, which depress sale prices and related sales commissions.

e. Lost Agents: CRMLS currently supplies Compass agent listing and agent transaction data to third-party software vendors, which package those data into products that brokerages buy and use to target and recruit Compass agents. The data that CRMLS forces Compass and its agents give to the MLS should not be sold to a technology company that in turn further sells that data with its agent recruitment technology. An MLS powering competitor recruitment tools strays far beyond the core mission of an MLS—it weaponizes Compass' operational data against Compass for competitor poaching.

f. Loss of Convenience and Harm to Innovation: Homeowners are

stripped of convenience surrounding their home sale, and consumers suffer from the commoditization of agent services and a reduction in pro-competitive choice.

76. Compass and its agents and homeowners have thus suffered antitrust injury as a result of the rules imposed by CRMLS and the agents and brokerages who control it. CRMLS's rules are anticompetitive because they foreclose homeowners and their agents from choosing a marketing strategy—limited, staged listing—that a substantial share of the market demands, thereby reducing product variety and consumer choice in the Relevant Markets. This restraint on competition directly causes Compass' injury: because Compass' phased marketing offering depends on the very marketing flexibility that CRMLS Rules 7.8 and 7.9 foreclose, CRMLS's rules prevent Compass from offering phased marketing to homeowners and agents in the CRMLS service area, making Compass less competitive in the Brokerage Services Market and the Agent Services Market. The mechanism of harm to competition and the mechanism of harm to Compass are one and the same: CRMLS's rules prevent Compass from offering homeowners and agents innovative strategies they want.

77. Compass is therefore a proper party to bring this action. Compass' injury is direct, not derivative: it flows immediately from CRMLS's rules and their enforcement against Compass agents and their homeowner clients. Compass' damages, including lost commissions, lost revenue from ancillary services, and diminished value of its technology platform, are neither speculative nor unduly complex to ascertain.

***CRMLS's Interference with Compass' Contracts and Relationships***

78. The California Brokerages enter into written exclusive right-to-sell listing agreements with homeowners in the CRMLS service area. Each listing agreement runs for a defined term (usually 180 days) and obligates Compass to market the

property in accordance with the homeowner's instructions. Homeowners who select See It First™ on Compass execute a written instruction directing Compass to withhold the listing from MLS distribution during the initial phases of marketing and acknowledge the disclosures described above. Compass earns a commission under each listing agreement when the property sells.

79. The California Brokerages also enter into written independent-contractor agreements with each of the agents affiliated with it in the CRMLS service area. Compass derives its revenue from the commissions generated by its agents' listings and sales, and each agent relationship therefore carries the probability of future economic benefit to Compass. Compass continuously recruits agents affiliated with competing brokerages, and its ability to offer See It First™ on Compass is a significant reason agents affiliate with Compass where See It First™ on Compass is available.

80. CRMLS and its controlling agents and brokerages have actual knowledge of each of these contracts and relationships. Its rules require every listing broker to input or register every exclusive listing agreement with CRMLS within two days of the agreement's effective date, CRMLS Rule 7.8, and require every participant to furnish to CRMLS, and to keep current, a list of all licensees affiliated with the participant, CRMLS Rule 4.5. CRMLS therefore knows, contemporaneously, the identity of every Compass homeowner and every Compass agent in the CRMLS service area and knows that CRMLS Rules 7.8 and 7.9 prevent Compass from honoring homeowners' instructions to market their homes through pre- or off-MLS marketing.

81. CRMLS's enforcement against Compass has escalated. According to CRMLS's own complaint, in 2025, CRMLS issued 89 fines for violations of CRMLS Rule 7.9, with eight going to Compass agents—under 10%.[48] As of October

[48] Complaint ¶ 59, ECF No. 1, *Cal. Reg'l Multiple Listing Serv., Inc. v. Compass, Inc.*, No. 1:26-cv-08796 (S.D.N.Y. Oct. 5, 2026).

5, 2026, CRMLS had processed approximately 300 fines related to violations of CRMLS Rule 7.9 in 2026, approximately 75 of which involved properties listed by Compass—about a quarter.[49]

82. By enforcing CRMLS Rules 7.8 and 7.9 through citations, fines of up to $2,500 per listing, mandatory disciplinary hearings, and the threat of suspension and expulsion from the MLS, CRMLS has made it impossible for Compass to perform its obligations in accordance with homeowners' instructions and has made performance of those listing agreements more costly and burdensome. For example:

a. A homeowner listed a home in Los Angeles County, California with Compass under an exclusive right-to-sell listing agreement. The homeowner was a longtime Compass client and instructed Compass in writing to market the property initially through a "Coming Soon" strategy. During the approximately one week that the property was in the "Coming Soon" phase, the Compass agent prepared the property for market through painting, landscaping, handyman work, staging, and photography. Without any warning, CRMLS issued a citation and a $2,500 fine to the Compass agent under CRMLS Rule 7.9 on or about August 31, 2026, and demanded that the property be entered into CRMLS. The Compass agent paid the fine and entered the property into CRMLS with a price that had not been tested through pre-MLS marketing. The listing is still active and has not been sold.

b. Another homeowner listed a home in Los Angeles County, California with Compass under an exclusive right-to-sell listing agreement. The homeowner had purchased the property from a Compass agent and specifically sought him out as the selling agent because of his expertise. The homeowner recently had a baby and could not fund staging,

[49] *Id.*

painting, or repairs. She did not want her home marketed widely while she had an infant at home and so directed the Compass agent in writing to market the property off-MLS initially. After further discussion with the agent, the homeowner also directed that the property be marketed through a newly introduced platform from CLAW, an MLS headquartered in Beverly Hills, called "MLS Exclusive." The listing complied fully with CLAW rules. Nevertheless, CRMLS cited the Compass agent for violating CRMLS Rule 7.9 because the property had been publicly marketed on Redfin and Compass through CLAW's "MLS Exclusive" program. Even though the agent was a member in good standing of both CRMLS and CLAW and had received no citations for more than a decade from any MLS, CRMLS issued the citation with no prior warning and insisted the property had to be entered into CRMLS. CRMLS issued the citation on September 4, 2026—the Friday before the Labor Day holiday weekend—along with a $2,500 fine and a demand that the property be listed on CRMLS within one business day "[r]egardless of the weekend or holiday." The Compass agent paid the $2,500 fine and removed the listing from CLAW's "MLS Exclusive" program to avoid receiving a second citation. The homeowner plans to return the property to the market in early 2027.

c. A third homeowner listed a home in Coachella Valley, California with Compass under an exclusive right-to-sell listing agreement. Because the homeowner wanted to test the asking price and sought additional time to move furniture before a full public launch, the homeowner directed the Compass agents who co-listed the home, in writing, to market it through a phased marketing strategy. The homeowner also

directed that the home be listed on CLAW as an "MLS Exclusive." The listing complied fully with CLAW rules. Because the home is in the Coachella Valley, which is served primarily by CRMLS and the Greater Palm Springs Board of Realtors ("GPSBR") rather than by CLAW, the homeowner also directed that the property be listed on GPSBR's exclusive listing program so that local desert-area agents who are not CLAW members would be able to see the listing on behalf of their homebuyer clients. CRMLS cited one of the Compass agents on or about August 31, 2026, with no prior warning, for violating CRMLS Rule 7.9 and issued a $2,500 fine. Because of the citation, the homeowner abandoned the initial marketing strategy and directed that the property be listed on CRMLS that same day. Because the listing had to go active immediately, the home was shown without any furniture or in-person staging, and the Compass agents had no opportunity to gather pricing feedback before the property was listed on the MLS.

d. A fourth homeowner listed a home in Los Angeles County, California with Compass under an exclusive right-to-sell listing agreement. The homeowner directed the Compass agent in writing to market the property initially through a phased marketing strategy because the home was in an unusual posture: it was the sole home left standing on its street following wildfire damage to all surrounding properties, making price exploration before a full MLS listing crucial. The home was also listed on CLAW as an "MLS Exclusive" and complied fully with CLAW rules. Nevertheless, CRMLS issued a citation on or about July 31, 2026, for violating CRMLS Rule 7.9 and issued a $2,500 fine. The fined agent was a CRMLS member for more than 30 years, and had served on CRMLS's own Grievance Committee, but was given no

warning or opportunity to cure. The citation forced the homeowner to do a full, public MLS launch earlier than planned, eliminating the opportunity to do pre-MLS price exploration for the uniquely situated property.

83. CRMLS took these actions intending to disrupt Compass' contracts and relationships, or with knowledge that their disruption was certain or substantially certain to result. CRMLS reaffirmed CRMLS Rule 7.9 and its enforcement after Compass explained its effect on Compass' homeowners and agents.

84. On September 8, 2026, Compass demanded that CRMLS cease fining or punishing its agents for publicly marketing office exclusive listings. On September 30, 2026, Ed Zorn, Vice President and General Counsel of CRMLS, rejected the demand and threatened counter-litigation against Compass. On October 5, 2026, one day before the deadline set in Compass' demand, CRMLS sued Compass in the Southern District of New York, seeking an anti-suit injunction and a declaration that its rules are lawful.

## CAUSES OF ACTION

### Count I

### PER SE ILLEGAL GROUP BOYCOTT IN VIOLATION OF SHERMAN ACT SECTION 1 (15 U.S.C. § 1)

85. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

86. The agent members of CRMLS's Board of Directors are direct competitors with each other and with Compass in the Brokerage Services Market and the Agent Services Market. They are therefore horizontal competitors with each other and with Compass.

87. Through CRMLS Rules 7.8 and 7.9, CRMLS forces Compass and its agents to forgo either (1) a critical input to their business (access to CRMLS in the CRMLS service area) or (2) the ability to offer innovative pre- and off-MLS marketing

strategies to homeowners and agents.

88. The agreement by and among CRMLS and its governing members to implement and enforce these rules is, therefore, a *per se* group boycott—a *per se* illegal combination, contract, or conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *Per se* treatment is warranted because CRMLS possesses market power in the MLS Market in the CRMLS service area; it controls access to an input—MLS participation—that agents need to compete effectively in the CRMLS service area; and the challenged rules lack any plausible efficiency justification, because they govern agents' marketing to the public rather than the integrity or sharing of data within the MLS.

89. As a direct and proximate result of Defendant's enforcement of its rules, Compass has been injured in its business and property, is suffering irreparable harm, and is suffering damages in an amount to be proved at trial.

## Count II

## COMBINATION, CONTRACT, AND CONSPIRACY CONSTITUTING UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF SHERMAN ACT SECTION 1 (15 U.S.C. § 1)

90. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

91. CRMLS is the dominant or sole MLS in the CRMLS service area. Membership in CRMLS and access to the MLS it operates is critical for agents working in the CRMLS service area. CRMLS is controlled by agents and brokerages who are horizontal competitors with each other and with Compass in the Brokerage Services Market and the Agent Services Market. CRMLS and the agents and brokerages who control it are using their control of CRMLS to restrain competition in the Brokerage Services Market and the Agent Services Market by implementing and enforcing CRMLS Rules 7.8 and 7.9, which prevent Compass from offering See It First™ on Compass to its homeowner clients and agents and prevents any other

agent from offering innovative pre- and off-MLS marketing strategies.

92. The rules' anticompetitive effects—reduced product variety, reduced competition among brokers on the timing, sequence, and scope of listing distribution, and reduced competition for agents—substantially outweigh any pro-competitive benefit. Any legitimate objective could be achieved through substantially less restrictive means, including the homeowner-instruction option CRMLS offered before 2019 and the rules of the many MLSs that permit pre-MLS public marketing. Alternatively, the anticompetitive character of the rules is obvious enough to warrant an abbreviated, "quick look" analysis.

93. As a direct and proximate result of Defendant's enforcement of its rules, Compass has been injured in its business and property, is suffering irreparable harm, and is suffering damages in an amount to be proved at trial.

## Count III

## COMBINATION IN RESTRAINT OF TRADE IN VIOLATION OF THE CARTWRIGHT ACT (CAL. BUS. & PROF. CODE § 16720 *et seq.*)

94. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

95. CRMLS and each member of its Board of Directors are each a "person" within the meaning of California Business and Professions Code Section 16702. CRMLS's adoption, maintenance, and enforcement of CRMLS Rules 7.8 and 7.9 is a combination of the capital, skill, or acts of two or more persons—CRMLS and its competing Board members have each agreed in writing to abide by and be bound by its rules—and therefore is a "trust" under Section 16720.

96. The purpose and effect of that combination is to create and carry out restrictions in trade or commerce, in violation of Section 16720(a), by preventing homeowners and their agents in California from publicly marketing listings except through CRMLS's distribution and by preventing Compass from offering phased

marketing in competition with CRMLS's agent-members. The combination is unlawful, against public policy, and void under Section 16726.

97. The combination is a group boycott that is unlawful *per se*. Alternatively, it is an unreasonable restraint of trade because its anticompetitive effects in the relevant markets alleged above substantially outweigh any procompetitive benefit, which in any event could be achieved through substantially less restrictive means.

98. The combination was formed and carried out in California, is enforced against agents licensed in California, and restrains the marketing of residential real estate located in California.

99. As a direct and proximate result of the combination, Compass has been injured in its business and property, including through lost listing contracts, commissions, and revenue from ancillary services; and diminished value of its technology platform. Compass' injury flows from that which makes the combination unlawful: the suppression of competition in how, when, and to whom homes are marketed.

100. Under California Business and Professions Code Section 16750(a), Compass is entitled to injunctive relief, three times its damages, interest, and its reasonable attorneys' fees and costs of suit.

## Count IV

## UNLAWFUL AND UNFAIR BUSINESS PRACTICES IN VIOLATION OF THE UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200 *et seq.*)

101. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

102. CRMLS's adoption, maintenance, and enforcement of CRMLS Rules 7.8 and 7.9 is an unlawful business act or practice within the meaning of California Business and Professions Code Section 17200 because it violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Cartwright Act, California Business and Professions Code Sections 16720 and 16726, as alleged in Counts I through III.

103. Independently, CRMLS's conduct is an unfair business act or practice within the meaning of Section 17200 because it threatens an incipient violation of the antitrust laws, violates the policy and spirit of those laws in that its effects are comparable to or the same as a violation of those laws, and otherwise significantly threatens and harms competition in the relevant markets, including by eliminating a marketing option that a substantial share of homeowners prefer and by foreclosing competition among agents on the timing, sequence, and scope of listing distribution.

104. Compass has suffered injury in fact and has lost money or property as a result of CRMLS's unlawful and unfair business practices, including lost commissions on listing agreements Compass lost or could not obtain, and fines Compass paid to CRMLS under CRMLS Rules 7.8 and 7.9.

105. Compass has demanded that CRMLS cease and desist its illegal conduct and CRMLS has refused to discontinue its illegal conduct enforcing CRMLS Rules 7.8 and 7.9.

106. Compass lacks an adequate remedy at law for the injuries addressed by this Count. Damages cannot remedy CRMLS's ongoing enforcement of its rules or the continuing loss of Compass' ability to offer See It First™ on Compass in the CRMLS service area.

107. Under California Business and Professions Code Section 17203, Compass is entitled to an injunction prohibiting CRMLS from enforcing CRMLS Rules 7.8 and 7.9 against the public marketing of listings that homeowners have directed to be withheld from MLS distribution, and to restitution of all fines Compass has paid to CRMLS under CRMLS Rules 7.8 and 7.9.

## <u>Count V</u>

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

108. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

109. Compass had existing economic relationships with identified third parties, including homeowners in the CRMLS service area who had engaged Compass under listing agreements, including the homeowners identified in paragraph 82 above. Each of those relationships carried a reasonable probability of future economic benefit to Compass in the form of commissions on the sale of the homeowners' properties.

110. CRMLS knew of those relationships, including through the listing agreements that its rules require Compass to deliver to it, and through Compass' communications with CRMLS described above.

111. CRMLS engaged in intentional acts designed to disrupt those relationships, or undertaken with knowledge that their disruption was certain or substantially certain to occur, by adopting, maintaining, and enforcing CRMLS Rules 7.8 and 7.9 against Compass and its agents through citations, fines, mandatory disciplinary hearings, and the threat of suspension and expulsion.

112. CRMLS's conduct was wrongful by a legal measure independent of the interference itself, because it violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Cartwright Act, California Business and Professions Code Sections 16720 and 16726, as alleged in Counts I through III.

113. CRMLS's conduct actually disrupted each of those relationships. As alleged in paragraph 82 above, each of the homeowners was forced to abandon their preferred pre-MLS marketing strategy.

114. As a direct and proximate result, Compass has suffered economic harm, including lost commissions and lost revenue from ancillary services, in an amount to be proven at trial.

## Count VI

## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

115. Plaintiffs repeat and incorporate by reference each of the foregoing

paragraphs of the Complaint.

116. Compass is party to valid and enforceable contracts with third parties, including exclusive right-to-sell listing agreements with homeowners in the CRMLS service area, each for a defined term and not terminable at will, including the listing agreements with the homeowners identified in paragraph 82 above. CRMLS is not a party to any of those contracts.

117. CRMLS knew of those contracts, including through the listing agreements that its rules require Compass to deliver to it.

118. CRMLS engaged in intentional acts designed to induce a breach or disruption of those contracts, or undertaken with knowledge that their breach or disruption was certain or substantially certain to occur, by adopting, maintaining, and enforcing CRMLS Rules 7.8 and 7.9 against Compass and its agents through citations, fines, mandatory disciplinary hearings, and the threat of suspension and expulsion.

119. Interference with the listing agreements, which are not terminable at will, is actionable without regard to whether CRMLS's conduct was independently wrongful because it violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Cartwright Act, California Business and Professions Code Sections 16720 and 16726, as alleged in Counts I through III.

120. CRMLS's conduct actually breached or disrupted those contracts. As alleged in paragraph 82 above, CRMLS prevented Compass from performing the listing agreements with each of the homeowners in accordance with those homeowners' written instructions and made Compass' performance of those agreements more costly and burdensome.

121. As a direct and proximate result, Compass has suffered damages, including lost commissions and lost revenue from ancillary services, in an amount to be proven at trial.

## REQUESTED RELIEF

Compass requests the following:

A. A declaration that CRMLS Rules 7.8 and 7.9 are an unlawful restraint of trade under 15 U.S.C. § 1 and California Business and Professions Code Sections 16720 and 16726, and an unlawful and unfair business practice under California Business and Professions Code Section 17200;

B. An injunction prohibiting CRMLS from adopting, maintaining, or enforcing CRMLS Rules 7.8 and 7.9, or any similar rule, to penalize any participant or subscriber for publicly marketing a property that the homeowner has directed be withheld from, or submitted later to, the MLS;

C. An award of treble actual, compensatory, and consequential damages in an amount to be proven at trial in addition to pre- and post-judgment interest as allowed by law;

D. An order disgorging CRMLS of its ill-gotten gains arising from enforcement of CRMLS Rules 7.8 and 7.9;

E. An award of compensatory damages on Counts V and VI in an amount to be proven at trial, together with pre- and post-judgment interest as allowed by law;

F. Injunctive relief and restitution under California Business and Professions Code Section 17203, including restitution of all fines paid by Compass to CRMLS for violation of CRMLS Rules 7.8 and 7.9;

G. An award of Plaintiffs' attorneys' fees and costs of suit; and

H. Such other relief that the Court deems just and equitable.

Dated: October 16, 2026

By: */s/ Joseph Tartakovsky*

Joseph Tartakovsky (SBN: 282223)
jtartakovsky@eimerstahl.com
EIMER STAHL LLP
71 Stevenson Street, Suite 400
San Francisco, CA 94105
Telephone: 415-508-8801

Nathan P. Eimer (*pro hac vice forthcoming*)
neimer@eimerstahl.com
Vanessa G. Jacobsen (*pro hac vice forthcoming*)
vjacobsen@eimerstahl.com
Alec Solotorovsky (*pro hac vice forthcoming*)
asolotorovsky@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: 312-660-7600

Brian Y. Chang (SBN: 287757)
bchang@eimerstahl.com
EIMER STAHL LLP
1999 South Bascom Avenue, Suite 1025
Campbell, CA 95008
Telephone: 408-889-1670

Howard D. Gest (SBN: 76514)
hgest@burhenngest.com
BURHENN & GEST LLP
12401 Wilshire Boulevard, Suite 200
Los Angeles, CA 90025
Telephone: 213-629-8787

*Attorneys for Plaintiffs Compass, Inc.; Compass California, Inc.; and Compass California III, Inc.*

# **JURY DEMAND**

(Fed. R. Civ. P. 38)

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Compass hereby demands a trial by jury as to all claims so triable.

Dated: October 16, 2026

By: <u>*/s/ Joseph Tartakovsky*</u>

Joseph Tartakovsky (SBN: 282223)
jtartakovsky@eimerstahl.com
EIMER STAHL LLP
71 Stevenson Street, Suite 400
San Francisco, CA 94105
Telephone: 415-508-8801

Nathan P. Eimer (*pro hac vice forthcoming*)
neimer@eimerstahl.com
Vanessa G. Jacobsen (*pro hac vice forthcoming*)
vjacobsen@eimerstahl.com
Alec Solotorovsky (*pro hac vice forthcoming*)
asolotorovsky@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: 312-660-7600

Brian Y. Chang (SBN: 287757)
bchang@eimerstahl.com
EIMER STAHL LLP
1999 South Bascom Avenue, Suite 1025
Campbell, CA 95008
Telephone: 408-889-1670

Howard D. Gest (SBN: 76514)
hgest@burhenngest.com
BURHENN & GEST LLP
12401 Wilshire Boulevard, Suite 200
Los Angeles, CA 90025
Telephone: 213-629-8787

*Attorneys for Plaintiffs*
*Compass, Inc.; Compass California, Inc.; and Compass California III, Inc.*