FILED
CLERK, U.S. DISTRICT COURT
10/28/2026
CENTRAL DISTRICT OF CALIFORNIA
BY mba DEPUTY
DOCUMENT SUBMITTED THROUGH THE ELECTRONIC DOCUMENT SUBMISSION SYSTEM

DMITRY SHKIPIN (*pro se*)
support@homeopenly.com
325 Sharon Park Dr. #416
Menlo Park, CA 94025
Telephone: 650.281.6962

UNITED STATES DISTRICT COURT

CALIFORNIA CENTRAL DISTRICT COURT

Compass, Inc., et al.

Plaintiffs,

v.

California Regional Multiple Listing Service, Inc.
Defendant.

Case No.: 5:26-cv-06121

**GEODOMA'S AMICUS CURIAE BRIEF IN SUPPORT OF NEITHER PARTY**

# CONTENTS

TABLE OF AUTHORITIES ........ 3

BACKGROUND ........ 4

ARGUMENT ........ 6

A. Massive "referral networks," including Zillow Preferred (Flex), are scamming consumers blind with ~40% RESPA-banned "success fees" kickbacks in the middle of housing affordability crisis. ........ 6

B. Alternative MLSs are harmed by the National Association of REALTORS® (NAR)'s Clear Cooperation Policy (CCP), which restrains trade in the MLS market. ........ 12

C. NAR-affiliated MLSs and Zillow maintain a broad non-compete agreement since Zillow's inception, which has only been breached recently with the introduction of Zillow Preview. ........ 15

D. Compass, to "double-end" their commissions with a 3-Phase Marketing Strategy (3PM), steers their own buyer clients toward pre-marketed listings that Compass KNOWS are overpriced by 2.9%. ........ 17

E. Since August 17, 2024, NAR-affiliated MLSs are lying about GSEs Interested Party Contributions (IPCs) limits applicability toward buyer-paid commissions under the terms of the Gibson et al. antitrust settlement. ........ 19

F. Eleven U.S. states (Alaska, Oregon, North Dakota, Kansas, Oklahoma, Missouri, Louisiana, Mississippi, Alabama, New Jersey and Tennessee) hold anticompetitive buyer broker rebate bans. ........ 23

CONCLUSION ........ 24

# TABLE OF AUTHORITIES

**Cases**

CRMLS v. Compass 1:26-cv-08796 (S.D.N.Y. Oct. 5, 2026) (Doc. 1) ........ 5
Dupuis v. Zillow Group Inc. 3:26-cv-05049 (W.D. Wash. Jun. 29, 2026) (Doc. 31) ........ 12
Gibson et al. ........ 19
Gibson v. NAR 4:23-cv-00788-SRB (W.D. Mo. Aug. 7, 2026) (Doc. 936) ........ 22
Gibson v. NAR 4:23-cv-00788-SRB (W.D. Mo. Jul. 27, 2026) (Doc. 930) ........ 21
Gibson v. NAR 4:23-cv-00788-SRB (W.D. Mo. Sep. 28, 2026) (Doc. 978) ........ 22
HomeLight, Inc. v. Shkipin, 694 F. Supp. 3d 1242, 1250 (N.D. Cal. 2023) ........ 8
McLaughlin v. HomeLight, Inc., 2:21-cv-05379-MCS, 2021 (C.D. Cal. Sept. 17, 2021) ........ 9
Ohio v. Am. Express Co., 138 S. Ct. 2274, 201 L. Ed. 2d 678 (2018) ........ 7
Peyton v. Veterans United Home Loans et al, 2:26-cv-04039 (W.D. Mo. May 6, 2026) (Doc. 35) ........ 4
Taylor et al. ........ 10
Taylor v. Zillow, Inc., 2:25-cv-01818 (W.D. Wash. Oct. 6, 2025) (Doc. 7) ........ 4
The PLS.com, LLC v. National Association of Realtors 32 F.4th 824, 839 (9th Cir. 2022) ........ 12
Thompson v. Metropolitan Multi-List, Inc., 934 F.2d 1566, 1571 (11th Cir. 1991) ........ 7
Top Agent Network, Inc. v. National Association of Realtors 3:20-cv-03198 (N.D. Cal. Jul. 22, 2024) (Doc. 121) ........ 12
Tuccori v. At World Properties, LLC, 1:24-cv-00150 (N.D. Ill. Apr. 21, 2026) (Doc. 149) ........ 23
United States v. Lemire, 720 F.2d 1327 (D.C. Cir. 1983) ........ 10
Waller v. Rocket Companies, Inc., 2:26-cv-10270 (E.D. Mich. Apr. 10, 2026) (Doc. 17) ........ 4
Zillow Group, Inc. v. Midwest Real Estate Data LLC 1:26-cv-05451 (N.D. Ill. Sep. 15, 2026) (Doc. 138) ........ 11

**Statutes**

12 C.F.R. § 1024.2(b)(29)(14) ........ 10
12 U.S.C. § 2607(a) ........ 8, 11

## BACKGROUND

Your Honor, today, U.S. residential online real estate portals with the NAR-affiliated MLSs IDX access (such as Zillow Preferred (Flex), Realtor.com (OpCity-UpNest), Rocket Homes (Redfin Partner Program), Movoto (OJO), etc.) are operating RESPA-banned "referral networks" of tens of thousands of "partner agents" (Source: Docket ID CFPB-2022-0037 Petition for Rulemaking Regarding Real Estate Broker Referral Fee Networks, US-CFPB (June 2, 2022), https://www.regulations.gov/document/CFPB-2022-0037-0001 ). CoStar Group Homes.com is the only major online real estate portal that utilizes RESPA-compliant subscription revenues.

This is a massive $15 billion-a-year kickback fraud, combined with sheer dominance, network effects, and interstate wire communications. Mere dozens of such "referral networks" have now implicated almost every single major brokerage in America (including Compass) in a massive RESPA/RICO fraud against their own customers. See Taylor v. Zillow, Inc., 2:25-cv-01818 (W.D. Wash. Oct. 6, 2025) (Doc. 7); Waller v. Rocket Companies, Inc., 2:26-cv-10270 (E.D. Mich. Apr. 10, 2026) (Doc. 17); Peyton v. Veterans United Home Loans et al, 2:26-cv-04039 (W.D. Mo. May 6, 2026) (Doc. 35)

Subject to this massive RESPA fraud, collusion, illegal steering, etc., all participants in our broken real estate market are acting irrationally - sometimes even responding to illegal conduct with more illegal conduct. For consumers and lawful businesses, our real estate market is the equivalent of a western saloon brawl. In this chaos, our federal courts now also face a multi-level problem in correctly resolving business disputes. These conflicts and breaches of major laws on a wide scale affect how 1,500,000+ real estate agents do business nationwide, when consumers buy and sell as many as 4,000,000 to 6,000,000 homes every year. This Court must remain vigilant and continue to render accurate decisions, despite the chaos.

According to the California Regional Multiple Listing Service, Inc. ("CRMLS") CRMLS v. Compass 1:26-cv-08796 (S.D.N.Y. Oct. 5, 2026) (Doc. 1) Complaint -

> "A multiple listing service is a network of real estate professionals (including agents, appraisers, and other subscribers) that agree to cooperate with each other by following the reasonable rules of the cooperative to timely and comprehensively share all the details and access to properties that are for sale or rent, including closing transactional information, resulting in an efficient, fair and equitable marketplace to benefit their clients. The MLS system has been a cornerstone of the American residential real estate market for more than a century, enabling the efficient matching of home sellers with home buyers"
>
> ...
>
> "In short, the Cooperation Rules are straightforward: they require that when a broker publicly markets a property for sale—through yard signs, websites, social media, flyers, or similar means - that property must also be submitted to the MLS for cooperation with other participating brokers. At the same time, the rules preserve the option for sellers and their brokers to market properties exclusively within a single brokerage as "No Cooperation Listings" (what Compass refers to as "office exclusives") without any obligation to submit to the MLS. The rules thus give sellers and brokers a clear choice: keep a listing entirely within one brokerage, or market it publicly to the broader world."

This ***sounds*** wonderful and pro-competitive. However, even assuming CRMLS has Article III standing to sue Compass: (1) their "efficient, fair and equitable marketplace" ***does not actually exist***; and (2) CRMLS Cooperation Rules require listings that are posted on competing MLSs to be also marketed within 24 hours ***to its subscribers*** (as opposed to the "broader world").

To truly restore competition and transparency in U.S. residential real estate, certain broken practices must change. This Court may think: "Well, solving these problems is not what we do here - we decide on the merits of the dispute before us." Yes, and I am not asking this Court to magically solve these problems - but to merely identify them and take them into account as factual truths. Truth is the alignment of reality, validated through empirical evidence and

interpreted within a specific, necessary context. Even though these specific (6) Items listed below do not directly address the alleged antitrust claims before this Court, I firmly believe that knowing about them can help this Court render the correct decisions as part of this specific dispute that Compass originated.

To start, this Court can easily validate these specific (6) Items and see that they are True (Source: https://schema.org/True ) because each of these Items is associated with specific breach of codified law(s) and clearly-referenced facts that can be tied with specific harm(s) to consumers and lawful businesses (with reduced competition and lack of transparency).

The information in this Brief attempts to summarize some of these logical conflicts (based on my personal continued efforts to fix our broken real estate industry). This information carries no legal weight; it can all be easily ignored or selectively processed. Nor do I know (or pretend to know) the law better than this Court. If the rules do not allow this information for any reason, it is not my intention to break any rules. I only know what happens in our broken real estate market, and that this information may help this Court correctly identify and resolve logical conflicts that Compass and CRMLS pleaded in their Complaints. ***Both parties*** come to this Court with very dirty hands and a series of absurd notions that have no logical grounds under U.S. laws and governing precedent; ***both parties*** are violating different laws, for different reasons.

## ARGUMENT

### A. Massive "referral networks," including Zillow Preferred (Flex), are scamming consumers blind with ~40% RESPA-banned "success fees" kickbacks in the middle of housing affordability crisis.

According to CRMLS,

"Zillow is a brokerage. This means they enjoy the same rights, and follow the same rules, as other participating brokerages. Among these important rights is the right to obtain an IDX listing feed, which they have stated will be used to display For Sale listing" (Source: https://go.crmls.org/zillow-listing-distribution-faqs )

CRMLS's assertion is entirely flawed. MLSs and online platforms serve real estate brokers as advertising customers, or relevant direct "consumers of the multilisting service." Thompson v. Metropolitan Multi-List, Inc., 934 F.2d 1566, 1571 (11th Cir. 1991).

The Supreme Court, in Ohio v. Am. Express Co., 138 S. Ct. 2274, 201 L. Ed. 2d 678 (2018) also correctly recognized a two-sided platform to "facilitate a single, simultaneous transaction" that offers "different products or services to two different groups who both depend on the platform to intermediate between them." In other words, all agreements between two-sided platforms and their customers are established between firms at different levels of distribution offering entirely different products or services. Logically, Zillow cannot act as a two-sided platform that services brokers as customers and, concurrently, argue that it operates in the same market as their broker-customers - the Supreme Court has expressly segregated a two-sided platform into an entirely different product market.

Zillow Group 2018 Form 10-K, plainly exposes the fact that Zillow Preferred (Flex)'s referral fees are actually sold as advertising fees charged by an advertising platform for advertising services:

> "In October 2018, we began testing a new Flex Pricing model for Premier Broker and Premier Agent ***advertising services*** in limited markets. With the Flex Pricing model, Premier Brokers and Premier Agents are provided with validated leads at no upfront cost, and they pay a performance ***advertising fee*** only when a real estate transaction is closed with one of their leads."

where Zillow Group further admits that:

> "to compete successfully for advertisers against future and existing competitors, [Zillow] must continue to invest resources in developing our ***advertising platform*** and proving the effectiveness and relevance of our advertising products and services." (See https://www.sec.gov/Archives/edgar/data/1617640/000161764019000005/q42018form10-kdoc.htm )

The self-admission that Zillow Preferred (Flex) acts as an "advertising platform" that shares in RESPA-covered compensation through its Preferred (Flex) program is also *a fortiori* proof that their platform-based ~40% referral fee taken from real estate broker commissions plainly must violate 12 U.S.C. § 2607(a).

Both the United States District Court for the Northern District of California and the United States District Court for the Central District of California have recently reasoned that a scheme similar to Zillow Preferred (Flex), called HomeLight, acts in a vertical servicer-customer relationship on a different level of the supply chain with +/-28,000 "partner agents." These federal district courts are both in the Ninth Circuit and have consistently reasoned that HomeLight's referral agent-matching platform is an "upstream" supplier of paid referrals to "downstream" real estate brokers, as opposed to a real estate broker acting on the same level of distribution.

> "To start, ***even though HomeLight is a licensed brokerage***, in the context of this agreement HomeLight and agents are not acting as horizontal competitors agreeing to charge customers the same price for a service they both offer. ... HomeLight's referral is better thought of as a vertical input to the partner agent's ultimate sale ... [where] … real estate agents [are] referral platform's ***intermediate consumers*** …" HomeLight, Inc. v. Shkipin, 694 F. Supp. 3d 1242, 1250 (N.D. Cal. 2023)

This same distinction was articulated in another recent legal dispute (McLaughlin v. HomeLight, Inc.) that also clarified that HomeLight functions as a referral platform, as opposed to "a real estate agent directly involved with home buyers or sellers in the purchase and sale of real estate." That court reasoned:

> "HomeLight contends that McLaughlin brings this lawsuit as an aggrieved ***potential consumer of its real estate agent referral service, not as a direct competitor.*** The Court agrees with HomeLight that McLaughlin does not plead facts supporting his conclusion that he and HomeLight are 'direct competitors.'"

McLaughlin v. HomeLight, Inc., 2:21-cv-05379-MCS, 2021 (C.D. Cal. Sept. 17, 2021)

In markers that do not involve RESPA-covered settlement services, there is typically no problem with this vertical servicer-customer relationship, at a different level of the supply chain. Businesses can easily serve other businesses as their customers. However, subject to RESPA, this servicer-customer relationship designation plainly precludes 12 U.S.C. § 2607(c)(3) safe harbor applicability for any of the "referral platform" referrals of RESPA-covered "settlement services."

An agent-matching platform may, of course, easily sell customer leads to real estate brokers or charge for subscriptions. However, such sales must never be tied to the outcome of the successful transaction or be based on a percentage of brokerages' commissions. The US-CFPB Advisory Opinion issued on February 7, 2023, further confirms that any operator of a "settlement services" digital comparison-shopping platform receives a prohibited referral fee in violation of RESPA when the operator receives a "thing of value" for referral activity. (See https://www.consumerfinance.gov/rules-policy/final-rules/real-estate-settlement-procedures-act-regulation-x-digital-mortgage-comparison-shopping-platforms-and-related-payments-to-operators/ )

Zillow merely attempts to meet 12 U.S.C. § 2607(c)(3) broker-to-broker exemption to collect massive ~40% referral fees (these kickbacks have been estimated to yield 32x more revenue than lawful upfront ads, because they are baked into federally-funded loans and paid only upon successful transaction), but this exemption simply does not apply to agent-matching platforms that serve real estate brokers as customers. Zillow Preferred (Flex) "success fees" are *de facto* a federal crime whenever a referral is made "incident to or a part of a real estate

settlement service involving a federally related mortgage loan" (Source: https://www.housingwire.com/articles/opinion-broker-to-broker-referral-exemption-does-not-apply-to-agent-matching-platforms/ )

Subject to this reality, in collusion with over 100,000 "Flex partner agents," Zillow Preferred (Flex) violates RESPA every (4) seconds, an estimated $5 billion RESPA fraud since 2018. This is not merely honest services fraud; it is also wire fraud, where RESPA-banned kickbacks are originated and transmitted with "use of interstate wire communication to further that scheme." United States v. Lemire, 720 F.2d 1327 (D.C. Cir. 1983)

Most consumers, of course, don't know this. On a single home purchase, Zillow Preferred (Flex) steals thousands from consumers by steering (what otherwise homebuyers could negotiate as tax-free rebates and/or competitive commissions). The 12 U.S.C. § 2607(c)(3) broker-to-broker exemption only allows "real estate agents or real estate brokers" where all parties deliver "services provided in connection with a prospective or actual settlement"… "for which a settlement service provider requires a borrower or seller to pay" to share cooperative broker commissions between one another. 12 C.F.R. § 1024.2(b)(29)(14). In fact, Consumers in Taylor et al. have also identified this exact problem:

> "The broker-to-broker referral exemption likewise does not apply, as ***Zillow does not act as a real-estate broker or perform brokerage functions in these transactions.*** Its Premier program operates as a referral marketplace that sells and allocate consumer leads, collects contingent "success fees" tied to closed transactions, and performs no brokerage services in the purchase or sale of property. See 12 U.S.C. § 2607(c)(3)" (Source: https://www.hbsslaw.com/sites/default/files/case-downloads/zillow-agent-class-action/2026-08-17-consolidated-third-amended-class-action-complaint.pdf )

CRMLS (same as all NAR-affiliated MLSs) has a rule that guards against this exact abuse of MLS data:

> "***Mere possession of a Broker's License is not sufficient to qualify for MLS data access participation.*** Rather, the requirement is that an individual or firm provides actual real estate brokerage services that requires a valid California license directly to clients The Participant is actively engaged when they endeavor during the operation of its real estate business to list real property on the MLS including making information and the property available for showings when in the client's best interest and/or to represent buyers or tenants in showing and making offers on MLS listed properties." (Source: https://go.crmls.org/crmls-rules-and-policies/ )

CRMLS categorically refuses to enforce this rule against improper IDX access by so-called "paper" brokerages. Zillow Preferred (Flex), Realtor.com (OpCity-UpNest), Rocket Homes (now, Redfin Partner Program), Movoto (OJO), etc. all utilize CRMLS-supplied listings to commit major RESPA fraud. These entities hold a "paper" real estate license, but they do not actually perform settlement services. In a recent ruling, Hon. John J. Tharp, Jr. also correctly explained this market designation as follows:

> "Here, Zillow asserts that "Compass, MRED and Zillow are horizontal competitors in the Listing Creation and Distribution market." … That relationship is not self-evident, nor is Zillow's proposed market one that courts have acknowledged or recognized. MRED does not create listings; it operates an MLS that collects and distributes listing information among its members—including both Zillow and Compass. Compass is a brokerage whose agents market and sell real estate—that is, it creates listings. ***Zillow operates a platform that neither creates nor distributes listings but rather receives and displays them.*** " Zillow Group, Inc. v. Midwest Real Estate Data LLC 1:26-cv-05451 (N.D. Ill. Sep. 15, 2026) (Doc. 138)

Even more bizarre is the fact that Preferred (Flex) Partner Agents also openly admit that these referral fees to not meet broker-to-broker safe harbor (even though it is just as illegal to pay referral fees banned under 12 U.S.C. § 2607(a)) in their antitrust lawsuit against Zillow:

> "***Zillow's conduct is not exempt under RESPA.*** The statute provides "safe harbors" from its broad prohibition on kickbacks, 12 U.S.C. § 2607(a), and Zillow argues that its conduct falls under one such provision: § 2607(c)(3), which exempts agreements between agents and brokerages. Mot. at 19. ***But although***

> ***Zillow is a registered broker, the safe harbor does not apply to the conduct alleged here.*** Section 2607(c)(3) "refers only to fee divisions within real estate brokerage arrangements when all parties are acting in a real estate brokerage capacity, and has no applicability to any fee arrangements between real estate brokers and mortgage brokers or between mortgage brokers." 12 C.F.R. § 1024.14(g)(v). ZHL is a licensed mortgage broker in 49 states, and it is too cute by half for Zillow to lean on its simultaneous registration as a real estate broker to exempt its lending arm from a RESPA provision that exempts only real estate brokers." Dupuis v. Zillow Group Inc. 3:26-cv-05049 (W.D. Wash. Jun. 29, 2026) (Doc. 31)

### B. Alternative MLSs are harmed by the National Association of REALTORS® (NAR)'s Clear Cooperation Policy (CCP), which restrains trade in the MLS market.

Alternative MLSs are trying to stop the NAR's CCP. The Ninth Circuit already reasoned that NAR's CCP restrains trade in the MLS market:

> "[NAR's] Clear Cooperation Policy ***prevented innovative competitors from entering the market*** and growing large enough to meaningfully compete with the MLSs, leaving both buyers' agents and sellers' agents with fewer choices, supra-competitive prices, and lower quality products." The PLS.com, LLC v. National Association of Realtors 32 F.4th 824, 839 (9th Cir. 2022)

Following the Ninth Circuit reversal, Hon. Vince Chhabria reasoned:

> "Second, and more importantly, PLS.com held that the relevant market is not the market for real estate, in which people buy and sell homes, ***but the market for real estate listing services, in which real estate agents subscribe to listing platforms and post listings to those platforms.*** That's the market in which the National Association of Realtors and its affiliate associations and MLSs compete with other listing service providers like Top Agent Network. Id. at 832–33, 839." Top Agent Network, Inc. v. National Association of Realtors 3:20-cv-03198 (N.D. Cal. Jul. 22, 2024) (Doc. 121)

In reality, there is no "single MLS," and NAR-affiliated MLSs are actually "private networks" like any other. MLSs cannot dictate to brokers how to advertise listings on alternative MLSs. If a broker wants to advertise on one MLS or another alternative MLS, not only should

they be able to - the federal law requires that this alternative option exists, without any restraints imposed by other dominant MLSs.

Contrary to general belief, NAR's CCP does not stop brokerage "private listings" at all. NAR's CCP only requires that "within one (1) business day of ***marketing a property to the public***, the listing broker must submit the listing to the MLS for cooperation with other MLS participants" where "***office exclusive listing***, direct promotion of the listing between the brokers and licensees affiliated with the listing brokerage, and one-to-one promotion between these licensees and their clients, ***is not considered public advertising.***" (Source: https://www.nar.realtor/about-nar/policies/mls-clear-cooperation-policy ). For instance, NAR's CCP allows Compass Private Exclusives as office-exclusive listings.

Subject to NAR's CCP, if an alternative listings service (such as Geodoma) is able to capture a listing from any real estate brokerage bound by NAR's CCP, such brokerage must also (within one (1) business day) submit that same listing to their NAR-affiliated MLS. This mandate imposed by the NAR-affiliated MLSs renders alternative services ineffective, even if our policies are better and more open.

Even though the Ninth Circuit (dating back to 2022) had already reasoned that "[NAR's] Clear Cooperation Policy prevented innovative competitors from entering the market," the NAR continues to enforce this illegal policy. There is no debate that NAR's CCP exists, and we have a clear and concise Ninth Circuit ruling that says that this policy restrains trade - the NAR does not care.

This, of course, has nothing to do with advertising of Compass brokerage listings. Compass is a customer of MLSs, and even though Compass provides listings for viewing to clients (or potential clients), it does so in brokerage capacity, not in MLS capacity. The MLSs

are hosts of broker-to-broker relationships, similar to a potluck gathering where each guest brings a dish to share with the group.

### 1. There are no "public" MLSs: NAR-affiliated MLSs are Private Listing Networks (PLNs) like any other.

On Gedoma, our lawful Clear Cooperation Policy (CCP) reads:

> Real estate professionals using the Platform, within one (1) business day of marketing a property by their brokerage, must submit the listing to Geodoma for cooperation with other users. Brokerage marketing includes, but is not limited to, brokerage website displays, flyers displayed in windows, yard signs, digital communications marketing (email blasts), etc. ***This policy specifically excludes marketing of a property via multi-brokerage listing services, online real estate listings services, and similar third-party multiple listing services applications.*** (Source: https://geodoma.com/fair-display )

Geodoma's CCP actually bans office-exclusive listings without affecting how brokers advertise listings by alternative means. This policy exists to allow for a fair playing field for all real estate brokers to share listings. Real estate brokers should not "game" the system by delaying their listings and having timely access to listings provided by other participants. A platform can and should impose rules upon all users for the greater benefits of all users, but such rules must end with the relationship between the platform and the user - the restraint MUST NEVER affect how the platform's users may choose to interact with alternative platforms.

Geodoma's CCP forces every brokerage user to share their listings in a timely manner. This policy also expires as soon as the brokerage user utilizes any alternative multi-brokerage listing service to advertise that same listing. In this way, if a brokerage user chooses to advertise a listing on an alternative multi-brokerage listing, they are never required to share that same listing on Geodoma. Gedoma's CCP is the antitrust-compliant, genuine anti-pocket listings policy that does exactly what it says it does - it bans the "delayed marketing" and "pocket listings."

The so-called Private Listing Networks (PLNs) are alternative multi-brokerage listing services that heavily restrict which brokers can access their inventory. However, CRMLS also heavily restricts access. As a homebuyer without a real estate license, a consumer cannot access CRMLS database directly. CRMLS feeds listings to Zillow, but Zillow is also a private network – if a homebuyer does not agree with Zillow's Terms of Service, they cannot use their services.

**C. NAR-affiliated MLSs and Zillow maintain a broad non-compete agreement since Zillow's inception, which has only been breached recently with the introduction of Zillow Preview.**

Since its inception, Zillow has entered into a wide non-compete agreement with NAR-affiliated MLSs. In exchange for Zillow's promise NOT to accept listings directly from real estate brokers, NAR-affiliated MLSs provide Zillow with their listings data feed with all current listings that NAR-affiliated MLS Participants provide to them.

> "Many MLSs are part of the Zillow Partnership Platform (ZPP), which was created by a direct relationship between Zillow and the originators (brokers) or keepers (MLSs) of the listing information. ***The common goal of the ZPP*** is to deliver and display accurate, curated and near real time listing data that serves both agents and consumers." (Source: https://www.zillow.com/agents/what-is-an-mls/ )

When Zillow first came online, NAR-affiliated MLSs (rightfully) recognized Zillow as a massive threat that could render NAR-affiliated MLSs platforms unnecessary (if these services were to truly compete with one another for access to real estate brokerage listings). The mutually-beneficial non-compete agreement between Zillow and NAR-affiliated MLSs allows Zillow to rely on a steady flow of listings and full inventory, without having to chase real estate brokers for the same listings data. In fact, real estate brokers do not enter listings on Zillow, and, instead, must "claim" listings provided to Zillow by NAR-affiliated MLSs feed:

> "Claiming a listing allows for this match to happen in case an email mismatch was supplied by a listing feed provider. ***The majority of listings on Zillow are syndicated by various listing feed providers.*** Some are directly from brokers while others come from third-party providers that work with agents and brokers.

> Often these listings provide an agent's email address that is different from the one an agent might use on Zillow. In these cases, these listings will not automatically be matched with an agent's Zillow account, but an agent can use this feature to "claim" them." (Source: https://www.zillow.com/c/about-linking-and-claiming-listings/ )

Technically, every listing service must procure its own listings. NAR-affiliated MLSs, Zillow Preferred (Flex), Realtor.com (OpCity-UpNest), CoStar Homes.com, Geodoma, etc. ALL must compete to receive listings from real estate brokerages. Today, as obvious as it may sound, the ONLY genuine competitors to NAR-affiliated MLSs are very weak network effects services outside the syndicated ecosystem (such as my minimum viable product platform, Geodoma). NAR-affiliated MLSs control the distribution of 95% of all "homes for sale" listings in the United States, and syndicate this data with all major portals. This continued dominance is a product of the non-compete syndication agreement of listings with portals.

An argument can be made that this portal syndication provides consumers with direct access to NAR-affiliated MLSs data feeds (something that only licensed NAR-affiliated MLS Participants had access to before MLS Aggregators made this data available online) - but at what cost?

Brokers who submit their listings to NAR-affiliated MLSs don't have any control over which portals take their listings data, even if they don't agree with the individual portal's business practices. Despite offering very different things, Zillow Preferred (Flex), Realtor.com (OpCity-UpNest), and CoStar Homes.com receive the same IDX feeds from the same NAR-affiliated MLSs. In my humble opinion, an open and competitive marketplace requires portals to attack the dominant NAR-affiliated MLSs with an alternative, rather than succumb to their IDX data feeds.

**D. Compass, to "double-end" their commissions with a 3-Phase Marketing Strategy (3PM), steers their own buyer clients toward pre-marketed listings that Compass KNOWS are overpriced by 2.9%.**

Off-MLS listings and Compass 3PM strategy (a.k.a. "See It First" since September 22, 2026) are two very different concepts. Compass's 3PM strategy merely delays the submission to MLSs in an effort to "game" the MLS participation. In fact, ~94% of all Compass 3PM continue to MLS, and only ~6% of homes are sold in the "pre-marketing" phase. If the home seller could not utilize the final MLS phase, they would never agree to the 3PM strategy.

The Compass research assessed Compass sell-side residential transactions from January 1, 2024, through December 31, 2024, finding that:

> "Homes pre-marketed as Compass Private Exclusives and/or Compass Coming Soon before going active on the MLS were associated with an average ***2.9% higher close price*** compared to those that were not pre-marketed." (Source: https://www.compass.com/newsroom/press-releases/3UJruvyWpqhodxQ4yShtLp/ )

There is a general discontent with this statistic: *"How is it possible that listings with a much lesser distribution sell for 2.9% MORE money?"* The explanation is hidden in the statistic itself: only ~6% of homes are sold for 2.9% MORE money (4.6% premium, from April 2025 through March 2026). Meaning, 94% of homes categorically FAIL to sell for 2.9% MORE money. Once these numbers are evaluated subject to this massive failure rate, it becomes self-evident that this 2.9% premium is not magic or advanced form of marketing – it just means that these homes are initially overpriced and, organically, fail to sell the vast majority of the time.

In these ~6% of Compass 3PM home sales, Compass favors the home seller by initially overpricing 3PM listings by 2.9%. Pre-marketed listings do not have to be priced lower because there are no "Days on Market" and "Price History" associated with pre-marketing. Pre-marketed listings allow home sellers to list their home for 2.9% more without the downside of the MLS-

tracked metrics. Alas, this also means that Compass (when it represents both the home seller and the homebuyer) must steer BUYER clients toward homes that they KNOW are overpriced by 2.9% to double-end the deal. This conduct violates the fiduciary duty to BUYER clients, by self-admission on the Compass website.

The math is such that with these ~6% of Compass 3PM home sales, Compass BUYER clients, statistically, overpay for homes by about $200 million a year - even though Compass holds a fiduciary duty to treat both their buyer and seller clients fairly. Compass should never have released this statistic, but they did.

Until Compass stops this illegal conduct, their entire brokerage is banned from using Geodoma (even though this lawful ban does not matter, because Geodoma does not yet have sufficient network effects to leverage against Compass), because I don't want to facilitate their illegal conduct on my platform. In theory, this ban harms the platform with less access to listings, but it is legally justified as a unilateral action by a platform against a user that operates in violation of the law (in the same way, a platform must never accept listings advertised for "straight white couples only" because housing discrimination is illegal).

In fact, Hagens Berman class action law firm is currently soliciting Chicagoland ***homebuyers*** for potential antitrust claims against Compass:

> "Compass analyzed 70,809 of its own closed residential transactions from April 2025 through March 2026, across all of its markets. It found that homes which began as a "Private Exclusive" or "Coming Soon" before reaching the MLS sold for 4.6% more than comparable homes that went straight to the MLS. That premium has risen sharply: in Compass's first such study, released in February 2025 and covering 2024 data, the company claimed a 2.9% premium. ***Compass frames these figures as a benefit for sellers. Attorneys allege they describe a cost borne by buyers, who bid on homes priced above what the open market would have set, with no way of knowing it.*** " (Source: https://www.hbsslaw.com/cases/chicago-home-prices-antitrust )

### E. Since August 17, 2024, NAR-affiliated MLSs are lying about GSEs Interested Party Contributions (IPCs) limits applicability toward buyer-paid commissions under the terms of the Gibson et al. antitrust settlement.

Since August 17, 2024, NAR has lied about GSEs' Interested Party Contributions (IPCs) limits applicability toward buyer-paid commissions post-settlement in Gibson et al. antitrust lawsuit. IPCs are contributions made by third parties with a vested interest in the transaction to cover costs that are ***the buyer's responsibility***. Since August 17, 2024, NAR-affiliated MLS Participants have been baking in buyer-paid closing costs into federally-funded loans as seller-paid commissions outside GSEs' IPC caps. This is a $500 billion False Claims Act fraud over seven years, until August 17, 2031 when the Gibson et al. settlement terms are set to expire. This affects every NAR-affiliated MLS Participant. This is the primary reason why "nothing has changed" in how commissions are paid since the settlement took effect in 2024.

Indeed, "Typical fees and/or closing costs paid by a seller in accordance with local custom, known as common and customary fees or costs, are not subject to the IPC limits" is 100% accurate public guidance on this issue (Source: https://singlefamily.fanniemae.com/media/38706/display ).

However, this guidance does not apply to "contributions made by third parties with a vested interest in the transaction ... used to cover costs that are typically the buyer's responsibility." (Source: https://selling-guide.fanniemae.com/sel/b3-4.1-02/interested-party-contributions-ipcs ). Both, NAR and CRMLS plainly admit that post-Settlement buy-side commissions are buyer-paid closing costs that are the buyer's responsibility -

> "While ***you [the buyer] are responsible for paying your real estate professional as outlined by your agreement***, you can still request, negotiate for, and receive compensation for your real estate professional from the seller or their agent." (Source: https://www.nar.realtor/the-facts/consumer-guide-to-written-buyer-agreements )

> and
>
> "I'm a Buyer's Broker. How will I get paid?
>
> Three examples are listed below:
>
> a. By direct payment based on a written buyer broker agreement signed by the buyer.
>
> b. Same as above, but instead of the Buyer paying their own Broker directly, ***the Buyer asks the Seller through the terms of the purchase agreement to contribute towards the Buyer's obligations***.
>
> c. If the Seller is unrepresented, the Buyer's Agent may approach the Seller directly using the Single Party Compensation Agreement (C.A.R. Form SP) ***to negotiate for the Seller to cover the Buyer's obligation***." (Source: https://kb.crmls.org/knowledgebase/nar-settlement-faqs/ )

Post-settlement, NAR (and, subsequently, CRMLS) deliberately established (and explicitly published) categorically false assertions, such as:

> "Fannie Mae and Freddie Mac published explicit confirmations that [until 2031] commissions for [NAR-affiliated MLS Participants] buyer agents paid by the seller ***would not count against the buyer.***" (Source: https://www.nar.realtor/the-facts/nar-settlement-faqs ).
>
> and
>
> "How will this affect my buyer's loan?
>
> According to NAR (https://www.nar.realtor/the-facts ) ***there should be no negative impacts on the buyer's loan should the seller contribute to the Buyer's Broker's compensation.*** NAR states that a seller paying the Buyer Agent fee as described above does not count against any lender concession limitations. They point to the fact that the lending rules do not classify the seller paying the Buyer's Agent as an Interested Party Contribution." (Source: https://kb.crmls.org/knowledgebase/nar-settlement-faqs/ )

No such guidance exists, nor could it exist in relation to any concessions *"the Seller [makes] to cover the Buyer's obligation."* GSEs merely correctly restated the existing guidance

that strictly applies to closing costs paid by a seller (i.e., costs that are the seller's responsibility) "are not subject to the IPC limits." (Source: https://singlefamily.fanniemae.com/media/38706/display ).

NAR (too clever by half) deliberately misinterpreted Fannie Mae and Freddie Mac April 15, 2024 guidance and devised their *"does not count against any lender concession limitations"* lie to preserve NAR-affiliated MLS Participants' price-fixing cartel from greater post-Settlement fallout. Even though, the catastrophic consequences of this lie expose all NAR-affiliated MLS Participants' buyer-paid commissions bound by the NAR Settlement against a massive False Claims Act liability - NAR, NAR-affiliated MLSs, and NAR-affiliated MLS Participants openly lie anyway, because they know that this massive mortgage fraud ($500 billion aggregated over seven years) does not typically carry any prison term (for that same reason Amazon Marketplace, Amazon Home Services, Walmart Marketplace, RealPage until recently, Uber, Lyft all engage in "hub-and-spoke" price-fixing: the law is seldom enforced criminally against price-fixing cartels too big to fail. See https://www.justice.gov/atr/page/file/1284066/dl?inline ). At worst, NAR, NAR-affiliated MLSs, and NAR-affiliated MLS Participants will face a series of follow-up civil lawsuits (by the government, or, more likely, *qui tam* under the False Claims Act). This lack of criminal consequences makes it worth devising a $500 billion mortgage fraud on this massive nationwide scale. See Gibson v. NAR 4:23-cv-00788-SRB (W.D. Mo. Jul. 27, 2026) (Doc. 930).

If NAR-affiliated MLS Participants followed the GSEs' IPC guidance correctly, NAR-affiliated MLS Participants would have to explain to buyer clients that by agreeing to pay for buyer-paid commissions, these fees count against them when calculated under GSEs' IPC caps. Post-settlement, NAR-affiliated MLS Participants lock homebuyers into mandated Buyer Broker Agreements (BBAs), but also tell them: *"Don't worry about it – we will just bake your 3%*

*Buyer-paid commission cost into the purchase offer – and it does not count against you."* Buyers do not KNOW that this false "does not count against you" notion also means that NAR-affiliated MLS Participants subject them to mortgage fraud (since August 17, 2024). Further, because these buyer-paid fees are improperly itemized on the Seller side of the HUD-1 Settlement Statement, NAR-affiliated MLS Participants' illegal conduct concurrently destroys Buyer's Article III Constitutional standing to raise a RESPA claim to keep their buyer-paid commissions free from RESPA-banned kickbacks. See Gibson v. NAR 4:23-cv-00788-SRB (W.D. Mo. Aug. 7, 2026) (Doc. 936).

In the meantime, buyer brokerage real estate commissions have gone UP post-Settlement (because buyers are explicitly told that "[buyer-paid] commissions for [NAR-affiliated MLS Participants] buyer agents paid by the seller would not count against the buyer," there is no tangible reason for buyers to negotiate commissions baked into 30-year mortgage loans). Neither is there a reason for sellers to argue over buyer-paid fees (sellers only care about the "net" proceeds from purchase offers, so long as their purchase offer amounts are sufficiently uplifted to account for these buyer-paid commission requests). See Gibson v. NAR 4:23-cv-00788-SRB (W.D. Mo. Sep. 28, 2026) (Doc. 978).

To stay in full compliance with GSEs' IPC Guidelines, post-Settlement, all NAR-affiliated MLS Participants MUST itemize their buyer-paid commissions on the Borrower side of the HUD-1 Settlement Statement (where all buyer-paid closing fees legally belong) until the terms of the Settlement expire in 2031. Under the law, buyer-paid closing costs cannot be baked into federally funded mortgage loans outside of the GSEs' IPC caps through a blatant misclassification of such fees as seller-paid closing costs. The buyers' firm obligation to pay a clearly defined compensation (e.g., X flat fee, X percent, X hourly rate – and not open-ended)

with ALL NAR-affiliated MLS Participants governs as closing costs that are the buyer's responsibility, even when coupled with the fact that buyers may (and often do) receive concessions to help them pay for compensation for their real estate professional from the seller or their agent.

Only true seller-paid commissions, where the home seller agrees to pay all (a.k.a. "full") commissions to their seller's real estate broker who, in turn, makes an a lawful fully-optional cooperative offer of Buyer Agent Commission (in 40 US states and D.C. jurisdictions where buyer brokers can lawfully offer buyer rebates) to share seller-paid real estate listing commission pursuant to cooperative brokerage arrangement made in a real estate brokerage capacity, subject to the 12 U.S.C. § 2607(c)(3) exemption - are customarily paid by the seller and are not required to be counted towards the IPC limits for the transaction.

On August 17, 2024, NAR-affiliated MLS Participants have all agreed to decouple their seller-paid commissions from buyer-paid commissions under mandated BBAs. Any concessions made by the seller to cover the buyer's obligation fall under GSEs' IPC caps (otherwise, buyers can bake an astronomical 20% buyer commission request into a home purchase offer - nothing stops them other than the GSEs' IPC caps). (See Tuccori v. At World Properties, LLC, 1:24-cv-00150 (N.D. Ill. Apr. 21, 2026) (Doc. 149) and https://geodoma.com/ipcs-limits ).

**F. Eleven U.S. states (Alaska, Oregon, North Dakota, Kansas, Oklahoma, Missouri, Louisiana, Mississippi, Alabama, New Jersey and Tennessee) hold anticompetitive buyer broker rebate bans.**

In 40 U.S. states, buyer brokers are allowed to negotiate buyer rebates with their clients, where "rebates are no different from simply charging a lower commission fee, and one should ask why the ability to rebate can mitigate the disincentive to compete through lower commission rates" according to an economic analysis paper published on the US-DOJ website titled *"How Rebate Bans, Discriminatory MLS Listing Policies, and Minimum Service Requirements Can*

*Reduce Price Competition For Real Estate Brokerage Services and Why It Matters"* (Source: https://www.justice.gov/atr/how-rebate-bans-discriminatory-mls-listing-policies-and-minimum-service-requirements-can-reduce )

In U.S. states where rebates are permitted, buyer brokers can reduce the commissions paid by the homebuyers, even if Buyer Broker Compensation (BAC) is offered in "blanket" form on MLS. If MLS operates in states without rebate bans, the policy of transmitting optional "blanket" offers of Buyer Broker Compensation (BAC) is not, by itself, harmful to buyers. However, in the U.S. states with active rebate bans, MLSs are unable to lawfully utilize optional blanket offers of compensation at all. Eventually, these bans are harmful to consumers and lawful businesses.

## CONCLUSION

Your Honor, our residential real estate market is cardinally broken and being able to solve for any of these deficiencies requires one not to participate in them. Illegal kickbacks and mortgage fraud are liabilities, misclassified as revenues. See "Steering, Kickbacks, Racketeering, Price Fixing, IPCs fraud, and Rebate Bans Harm All Consumers, Our Government, and Lawful Competitors" (Source: https://litesand.wordpress.com/2026/07/01/steering-kickbacks-racketeering-price-fixing-ipcs-fraud/ )

Lawful platforms are now facing an absurd reality of having to sue our brokerage customers for injunctive relief (under (51) different UCL/UDAP state statutes) to force them into compliance. In more ways than one, it is not optional for any lawful platform to serve real estate agents as valued customers when we also know their broker-of-record is engaged in fraud. (Source: https://litesand.wordpress.com/wp-content/uploads/2026/10/compass-cease-and-desist-letter-october-20-2026.pdf )

Thank you for your time,

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 28, 2026

*/s/ Dmitry Shkipin*

Dmitry Shkipin, pro se

cc:

Nicole Sarrine, Deputy Assistant Attorney General for Civil Conduct

(Nicole.Sarrine@usdoj.gov)

U.S. Department of Justice, Antitrust Division

Daniel Guarnera, Director

(Daniel.Guarnera@ftc.gov)

U.S. Federal Trade Commission, Bureau of Competition